Argued and submitted December 4, 1985, affirmed April 8, reconsideration denied
May 20, 1986

CAIN,
*Respondent on review,*

*v.*

RIJKEN et al,
*Defendants,*
*and*

SISTERS OF PROVIDENCE, dba
Providence Medical Center,
*Petitioner on review.*

(CC 8102-00699; CA A29835; SC S31950)

Paul R. Duden, of Tooze, Marshall, Shenker, Holloway & Duden, Portland, argued the cause for petitioner on review. With him on the petition were Eric J. Neiman and Montgomery W. Cobb, Portland.

Larry W. Stuber, of Ringo & Stuber, P.C., Corvallis, argued the cause for respondent on review.

JONES, J.

## JONES, J.

This is a wrongful death claim brought by James G. Cain's personal representative after Cain was killed when his automobile collided with an automobile driven by Paul Rijken.[1] Plaintiff alleges that defendant Providence Medical Center (Providence) negligently failed to supervise or control Rijken and failed to warn the Psychiatric Security Review Board (PSRB)[2] that Rijken was incompetent to drive a motor vehicle, and that Providence's negligence caused Cain's death. At the time of the accident, Rijken had been conditionally released by PSRB to the day treatment program of Providence,[3] a provider of community mental health services under ORS 161.390(3).

The trial court granted Providence's motion for summary judgment, holding that Providence did not owe a legal duty to plaintiff's decedent. The Court of Appeals reversed, holding that Providence had a duty to use reasonable care to control the patient and that the question of foreseeable harm was a disputable question of fact that could not be resolved by summary judgment. 74 Or App 76, 700 P2d 1061 (1985). We allowed review to decide whether plaintiff, whose decedent

[1] Neither defendant Rijken nor defendant State of Oregon is a party to this appeal and the state settled with plaintiff before trial.

[2] The 1977 Oregon legislature created the Psychiatric Security Review Board (PSRB) to improve the state system for dealing with persons found not responsible for crimes by reason of mental disease or defect. Before PSRB was created, individual judges retained jurisdiction over such persons. *Former* ORS 161.335 to 161.345 (1975) (*repealed by* Or Laws 1977, ch 380) required judges to determine whether persons should be committed to the state hospital and to decide when to release committed persons. Judges were ill-equipped for this role and often deferred to hospital recommendations. Forensic wards of the state hospital became overcrowded, and dangerous persons were sometimes released after short stays. *See* Rogers, *1981 Oregon Legislation Relating to the Insanity Defense and the Psychiatric Security Review Board,* 18 Willamette L Rev 23, 25-27 (1982).

Under the present statutes, PSRB retains jurisdiction after the court's disposition. PSRB is composed of five members: a lawyer, a psychologist, a psychiatrist, a person familiar with probation and parole, and a lay person. ORS 161.385(2). PSRB conducts hearings to determine the disposition of persons within its jurisdiction. ORS 161.346. PSRB may commit, conditionally release or discharge persons within its jurisdiction. ORS 161.341, 161.336, 161.356.

[3] PSRB may grant a conditional release when it determines that the person who was judged not responsible by reason of mental disease or defect "can be adequately controlled with supervision and treatment if conditionally released and that necessary supervision and treatment are available." ORS 161.336(1). By definition, the person conditionally released "presents a substantial danger to others." *Id.*

was killed by the acts of a person under PSRB's jurisdiction, has a civil action against a community mental health provider for failing to protect decedent from that person's unintentional acts. We hold that Providence, having accepted Rijken as a mental health patient under ORS 161.390(3), had a duty of reasonable care in treating its patients and controlling its patients' acts, that a breach of this duty would entail potential liability to persons foreseeably endangered thereby, and that whether Rijken's acts and the risk to members of the public were foreseeable is a question of fact to be decided by a jury or a court sitting as factfinder.

Paul Rijken was brought within PSRB's jurisdiction in 1978. On April 20, 1978, Rijken led police on a high-speed automobile chase through the streets of Washington and Multnomah counties. During the chase, Rijken hit and seriously damaged two cars, and at one point he drove into oncoming lanes of traffic at 80 miles per hour. The chase ended at Rijken's apartment, where police arrested him for violations of criminal and traffic laws, including recklessly endangering, criminal mischief, failing to remain at the scene of an accident and attempting to elude. On May 8, 1978, the trial court found Rijken not responsible for the charges against him by reason of mental disease or defect, bringing Rijken into PSRB's jurisdiction. ORS 161.327; *see Adams v. Psychiatric Review Bd.,* 290 Or 273, 277-78, 621 P2d 527 (1980). PSRB committed Rijken to the state hospital. ORS 161.341(1).

On December 29, 1978, PSRB conditionally released Rijken from the state hospital to live with his parents in California, where he was to receive outpatient treatment at a local Veterans' Administration hospital. Rijken moved back to Portland in December 1979. On February 19, 1980, PSRB modified the conditional release, allowing Rijken to stay in Portland and ordering him to enroll in the psychiatric day treatment program at Providence. Providence contracted with Multnomah County to provide mental health care to Rijken and accepted him as a patient. Providence diagnosed Rijken as schizophrenic, schizo-affective type, and subject to episodes of manic activity, poor judgment and hallucinations.

On April 18, 1980, Rijken's conditional release was

revoked and he was recommitted to the Oregon State Hospital. On May 30, 1980, he was again conditionally released to Providence. On his discharge summary, the Oregon State Hospital physician checked boxes on a form indicating that Rijken was "Improved," "Competent" and "May Drive." On December 26, 1980, Rijken admitted himself to Providence's residential treatment program because he was anxious and depressed and feared loss of control. He was permitted to leave Providence on December 29, 1980, but at 1:30 a.m. on December 30 he reported by phone to Providence that he was experiencing auditory hallucinations. He met with a therapist at Providence on December 31, complained of visual and color distortions, and stated that he would "keep a low profile" over the New Year's holiday. On January 2, 1981, he missed a scheduled appointment. Providence took no action. On January 4, 1981, Rijken, while driving 70 miles per hour in a 35 mile-per-hour zone, ran two red traffic signals and collided with a car at a Portland intersection, killing Cain. Plaintiff then sued Rijken, the State of Oregon and Providence for the wrongful death of Cain.[4]

---

[4] The relevant allegations against Providence are as follows:

"That the legal cause of the said collision and the plaintiff's decedent's death was:

(3) Defendant PROVIDENCE MEDICAL CENTER's negligence at said time and place in one or more than one of the following particulars:

a. PROVIDENCE's failure to adequately supervise and control PAUL RIJKEN's conduct, including access to a motor vehicle when it knew or should have known that PAUL RIJKEN had been hospitalized in mental institutions periodically since he was 21 years of age; that he had a chronic mental illness characterized by periodic psychotic episodes with a past history of auditory hallucinations as well as other mental infirmities which greatly impaired his ability to safely control a motor vehicle.

b. PROVIDENCE's failure to warn or notify the Department of Motor Vehicles that defendant PAUL RIJKEN was incompetent to drive a motor vehicle or was afflicted with mental infirmities which made it unsafe for defendant PAUL RIJKEN to drive a motor vehicle upon public highways.

c. PROVIDENCE's failure to warn or notify the Psychiatric Security Review Board that defendant PAUL RIJKEN was incompetent to drive a motor vehicle or was afflicted with mental infirmities which made it unsafe for defendant PAUL RIJKEN to drive a motor vehicle upon public highways.

d. PROVIDENCE's failure to warn or notify the Psychiatric Security Review Board that defendant PAUL RIJKEN voluntarily admitted himself to an in-patient treatment program at PROVIDENCE MEDICAL CARE CENTER on December 26, 1980.

## I.   Is Providence an Agent of the State?

In its answer to plaintiff's complaint, Providence claimed that it had acted as the agent of a public body, and that it was immune from liability because its actions were discretionary. Because we thought this issue might be dispositive as a matter of law, although not argued on appeal, we requested memoranda from counsel concerning Providence's possible immunity under the Oregon Tort Claims Act.[5]

The Oregon Tort Claims Act, ORS 30.260 to 30.300, permits suits against "every public body * * * for its torts and those of its officers, employes and *agents* acting within the scope of their employment or duties." ORS 30.265(1) (emphasis added). ORS 30.265(3)(c) immunizes public bodies from liability for "[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." The question of

---

e.   PROVIDENCE's failure to warn or notify the Psychiatric Security Review Board that defendant PAUL RIJKEN was released from the PROVIDENCE MEDICAL CENTER in-patient treatment program on December 29, 1980.

* * * * *

i.   PROVIDENCE's failure to notify the Psychiatric Security Review Board that defendant PAUL RIJKEN was experiencing auditory hallucinations exhibiting other signs of decompensation from December 29, 1980 through January 4, 1981.

j.   PROVIDENCE's failure to adequately diagnose and treat defendant PAUL RIJKEN's mental illness and his inability to operate a motor vehicle.

* * * * *

l.   PROVIDENCE's failure to adequately devise and supervise a specific treatment plan for defendant PAUL RIJKEN for the 1980 New Year's Holiday.

m.   PROVIDENCE's failure to notify the Psychiatric Security Review Board that defendant PAUL RIJKEN missed a scheduled appointment on January 2, 1981."

[5] We asked the following questions:

"1. Is Providence Medical Center an 'agent' of the state under ORS 30.265(1), and therefore covered by the Oregon Tort Claims Act, ORS 30.260 - 30.300?

"2. If Providence Medical Center is covered by the Oregon Tort Claims Act, were its actions in treating Paul Rijken discretionary functions under ORS 30.265(3), rendering it immune from liability?"

Providence's immunity under the Tort Claims Act is twofold: First, did Providence act as an "agent" of the state within the meaning of ORS 30.265(1); and, second, if Providence was an agent, were Providence's actions in treating Rijken "discretionary functions" within the meaning of ORS 30.265(3)(c)?

This court has not construed the meaning of "agent" in the context of ORS 30.265(1). In this case, the contracts between Providence and the state help to resolve the question of agency. Providence provided services for persons within PSRB's jurisdiction under contract as part of Multnomah County's community mental health program. ORS 161.390. Providence's duties concerning its treatment of conditionally released persons were governed by statute, ORS 161.336, by administrative rules governing mental health services, OAR 309-14-005 to -040,[6] and by specific contracts.

Two contracts governed the relationship between Providence and the state Mental Health Division. First, the contract between the state Mental Health Division and Multnomah County provided in part:

> "Contractor [Multnomah County] agrees that it is an independent contractor and not an agent of the Division, and that Contractor shall, up to the limits of public body tort liability specified in ORS 30.270, be responsible for any and all claims, demands and causes of action of any kind and character arising in favor of any person, including the Contractor and

---

[6] These rules describe the "general administrative standards for Mental Health Division community mental health contractors and their component parts." OAR 309-14-000. OAR 309-14-020(5) states:

> "The local mental health authority [e.g., Multnomah County] shall monitor all community mental health service elements [e.g., Providence] to assure that:
>
> (a) Service elements are provided as specified in the contract with the Division; and
>
> (b) Service elements are in compliance with these rules and other applicable Division administrative rules."

OAR 309-14-020(3)(b) states that "there shall be a contract between the local mental health authority and the subcontract agency specifying the authorities and responsibilities of each party and conforming to the requirements of any Division rule pertaining to contracts." OAR 309-14-030 requires subcontractors such as Providence to establish a schedule of fees based on cost and adjusted for the patient's ability to pay, a quality assurance program, a current organization chart showing lines of authority, and written personnel policies. OAR 309-14-035 provides for the establishment of procedures for subcontractors to communicate with state hospitals when patients are admitted to and discharged from the state hospital.

its employes, on account of personal injuries, or death, or damage to property occurring, growing out of, incident to, or resulting directly or indirectly from the operations or activities of the Contractor."

Second, the contract between Multnomah County and Providence provided in part:

"THE CONTRACTOR [Providence] AGREES:

\* \* \* \* \*

"1.  To perform, or cause to be performed as an independent contractor, and not as an agent of the County, the necessary services to conduct the specific programs \* \* \*."

However, the parties' description of their relationship does not control the legal implications of their relationship. The question is not only what the parties say they are but also what they do. Merely calling oneself an independent contractor does not *ipso facto* make one an independent contractor.

■ In determining whether the principal should be subject to vicarious liability for the acts of an agent, this court examines what control the principal exercises over the agent. *Peeples v. Kawasaki Heavy Indust., Ltd.,* 288 Or 143, 150, 603 P2d 765 (1979) (finding neither actual control by manufacturer over dealer, nor any right to control); *Goodrich v. Ford Motor Co.,* 269 Or 399, 407, 525 P2d 130 (1974); *Kowaleski v. Kowaleski,* 235 Or 454, 385 P2d 611 (1963). However, in *Peeples,* 288 Or at 147, and *May v. Brown,* 261 Or 28, 40, 492 P2d 776 (1972), this court suggested that vicarious liability must be premised not only on the principal's control over the contractor, but also on whether the contractor carried forward the principal's business.

Although it can be argued that Providence was simply acting as an extension of PSRB and carrying out PSRB's mandated statutory duties, the contracts and actions of the parties indicate that Providence acted independently of any meaningful direction or control from the state Mental Health Division and PSRB. Providence supervised Rijken's day-to-day treatment and decided whether he could continue treatment as an outpatient or whether he would require custodial treatment. Apparently, the state merely contracted with

Multnomah County, which in turn contracted with Providence to treat Rijken during his conditional release. The record demonstrates that the state Mental Health Division and PSRB did not supervise Rijken's treatment in detail; rather PSRB only required that Providence report on Rijken's progress once a month for the first six months following Rijken's release from the state hospital in May 1980 and, depending upon his progress, perhaps less often thereafter. Providence agreed to notify PSRB promptly if Rijken's case coordinator became aware of any violations by Rijken of his conditional release plan.

This issue of agency and immunity was raised only by an allegation in defendant's pleadings and no affidavits, depositions or admissions were filed with the trial court pursuant to ORCP 47C. Because this issue was not fully developed at the trial level, and we cannot decide from this record whether there are disputable facts relevant to this issue, we cannot decide it at this time as a matter of law.

Because we cannot decide whether Providence was an agent for the state, we do not discuss whether Providence's treatment of Rijken was a discretionary function within the meaning of ORS 30.265(3)(c). We now turn to the issue whether Providence owed a duty to Cain and could be liable in negligence to plaintiff.

II. Does Providence Owe a Duty to Plaintiff's Decedent?

Providence contends that it is not liable to plaintiff for any negligence in controlling Rijken because it "owed no duty to" plaintiff's decedent. If defendant had no obligation other than what might arise from the common law of negligence to protect third parties against any risks posed by Rijken's unstable mental condition, we would have to consider what that common law duty was and whether it extended to making defendant liable to plaintiff's decedent. In that analysis, two elements generally are measured by a test of foreseeability.

First, a person's conduct constitutes negligence if it foreseeably poses an unreasonable risk of harm. If so, the person has a "duty" to avoid such conduct. As this court stated in *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 609, 469 P2d 783 (1970):

"This idea of limiting liability to that which can be anticipated is formulated into the foreseeability test for negligence, which states that one is negligent only if he, as an ordinary reasonable person, ought reasonably to foresee that he will expose another to an unreasonable risk of harm. Foreseeability is an element of fault; the community deems a person to be at fault only when the injury caused by him is one which could have been anticipated because there was a reasonable likelihood that it could happen."

■ Second, a defendant generally will be liable to plaintiff for negligently caused injuries only if the plaintiff and the injury are of a kind foreseeably within the scope of the risk that made the conduct negligent. Defendants sometimes deny liability based on this second element by arguing that although they may have breached a duty to someone, it was not a "duty *to*" the plaintiff. But that argument can be more directly phrased in terms of foreseeability, and perhaps other reasons for extending or limiting the scope of liability for defendant's negligence, than by using the conclusory word "duty" as a premise. *See* Prosser & Keeton, The Law of Torts 358 (5th ed 1984). As we said in *Nylander v. State of Oregon,* 292 Or 254, 258, 637 P2d 1286 (1981):

"When 'duty' is used in this second fashion to describe that, under otherwise identical circumstances, one may have a 'duty toward' some persons but no 'duty toward' other persons to meet certain standards of conduct, the term serves rather circularly to state a conclusion about a lawsuit by a person injured by substandard conduct, but it does not describe one's duty in the ordinary sense of obligatory conduct apart from the existence or characteristics of a particular plaintiff."

■ In the present case, defendant's obligation to supervise Rijken's conduct for the protection of the public was imposed by sources other than the common law of negligence. Instead of referring to decisions based on psychotherapists' common law duty to persons harmed by patients, we consider the statutes that may create Providence's duty toward patients and the general public. As recognized in *Miller v. City of Portland,* 288 Or 271, 604 P2d 1261 (1980), and *Bob Godfrey Pontiac v. Roloff,* 291 Or 318, 338, 630 P2d 840 (1981) (Linde, J., concurring), one who violates a statute enacted for protection of others may be civilly liable in damages for injuring the

protected interest even when there is no corresponding common law basis of recovery.[7] We therefore need not decide whether there is a common law civil action for a third party who is injured by the acts of a psychotherapist's patient. Nor need we venture into the controversial thicket of tort law that grows from *Tarasoff v. University of California*, 17 Cal 3d 425, 131 Cal Rptr 14, 551 P2d 334 (1976), and its progeny.[8]

In *Tarasoff*, the California Supreme Court found that a psychotherapist owed a duty of reasonable care to protect the intended victim of an outpatient.[9] *Tarasoff* concerned an outpatient who killed plaintiff's daughter after telling his therapist that he intended to do so. The California court found

---

[7] In *Brennen v. City of Eugene*, 285 Or 401, 591 P2d 719 (1979), defendant's liability was premised on common law negligence, but the negligence lay in breach of an obligatory standard of conduct, a city code provision that forbade issuing a taxicab license unless the applicant had adequate liability insurance. The court held that defendant's failure to observe this requirement was not "negligence per se," but without the duty imposed by the code, there likely would have been no basis to hold the city liable.

[8] *Tarasoff* has inspired many law review articles and case notes. *See, e.g.,* Arons, *Working in the "Cuckoo's Nest": An Essay on Recent Changes in Mental Health Law and the Changing Role of Psychiatrists in Relation to Patient and Society,* 9 U Tol L Rev 73 (1977); Ayres & Holbrook, *Law, Psychotherapy and the Duty to Warn: A Tragic Trilogy?,* 27 Baylor L Rev 677 (1975); Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma,* 62 Calif L Rev 1025 (1974); Givelber, Bowers & Blitch, Tarasoff, *Myth and Reality: An Empirical Study of Private Law in Action,* 1984 Wis L Rev 443; Griffith & Griffith, *Duty to Third Parties, Dangerousness, and the Right to Refuse Treatment: Problematic Concepts for Psychiatrist and Lawyer,* 14 Cal W L Rev 241 (1978); Murphy, *Evolution of the Duty of Care,* 30 De Paul L Rev 147 (1980); Laughran & Bakken, *The Psychotherapist's Responsibility Toward Third Parties Under Current California Law,* 12 Western St U L Rev 1 (1984); Merton, *Confidentiality and the "Dangerous" Patient: Implications of* Tarasoff *for Psychiatrists and Lawyers,* 31 Emory L J 263 (1982); Sloan & Klein, *Psychotherapeutic Disclosures: A Conflict Between Right and Duty,* 9 U Tol L Rev 57 (1977); Slovenko, *Psychotherapy and Confidentiality,* 24 Clev St L Rev 375 (1975); Stone, *The* Tarasoff *Decisions: Suing Psychotherapists to Safeguard Society,* 90 Harv L Rev 358 (1976); Note, *Affirmative Duties in Tort Following* Tarasoff, 58 St. John's L Rev 492 (1984); Note, *Affirmative Duty After* Tarasoff, 11 Hofstra L Rev 1013 (1983); Note, *Psychotherapists and The Duty to Warn: An Attempt at Clarification,* 19 New Eng L Rev 597 (1984); Note, *Where the Public Peril Begins: A Survey of Psychotherapists to Determine the Effects of* Tarasoff, 31 Stan L Rev 165 (1978); Note, *Psychiatrists' Duty to the Public: Protection from Dangerous Patients,* 1976 Ill L Forum 1103.

[9] On rehearing the *Tarasoff* court vacated its previous decision at 118 Cal Rptr 129, 529 P2d 553 (1974). The first decision held that a therapist who had reason to believe that a patient would harm a person had a duty to warn the potential victim. 118 Cal Rptr at 131. The second decision held that the therapist had a duty to act reasonably under the circumstances, which could be discharged in several ways, including a warning. 17 Cal 3d 425, 131 Cal Rptr 14, 551 P2d 334 (1976). One commentator states that the "outraged reaction" to its first decision caused the court to rehear the case. Merton, *supra* n 8, 31 Emory L J at 294.

that the therapist owed an affirmative duty to act based on the special relationship between therapist and outpatient. Relying on section 315 of the Restatement (Second) Torts (1965),[10] the *Tarasoff* court wrote that a special relationship "may support affirmative duties for the benefit of third persons." 17 Cal 3d at 436. *See also Thompson v. County of Alameda*, 27 Cal 3d 741, 167 Cal Rptr 70, 614 P2d 728 (1980); *Bradley Center, Inc. v. Wessner*, 250 Ga 199, 296 SE2d 693 (1982); *Peck v. Counseling Service of Addison County*, 499 A2d 422 (Vt 1985); *Petersen v. State*, 100 Wash 2d 421, 671 P2d 230 (1983).

We mention *Tarasoff, et al.*, only to emphasize that we do not rest our decision in the case at bar on the common law principles on which those cases were founded. These decisions are essentially irrelevant because Providence's obligation is derived from the statutes defining the assignment Providence undertook for PSRB.

Common law principles of reasonable care and foreseeability of harm are relevant because this case does not fall within a mandated statutory duty such as that described in *Nearing v. Weaver*, 295 Or 702, 670 P2d 137 (1983). In

---

[10] Section 315 of the Restatement (Second) Torts (1965), states a general rule regarding special relationships:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Although this court has considered section 315, it has not adopted it. *See Christensen v. Epley*, 287 Or 539, 601 P2d 1216 (1979) (this court could not agree on the applicability of the special relationship rule). Moreover, section 315 itself states a negative; it does not define any liability based on a "special relationship."

Too often courts have applied the special relationship rule with scanty analysis. As one commentator noted, "the judicial method of applying the label of 'special relationship,' without articulating the components of the relationship that create affirmative duties, does not itself rise to the level of principled justification." Note, *Professional Obligation and the Duty to Rescue: When Must a Psychiatrist Protect His Patient's Intended Victim?*, 91 Yale L J 1430, 1437 (1982). Courts have employed the special relationship rule to avoid difficult foreseeability questions. However, as another commentator wrote, "[t]he special relationship is not intended to operate as a talisman that magically imposes an affirmative duty; rather, it serves as an indication that the defendant must be so situated that a total denial of affirmative duty would not further the underlying policies of [section 315]." Note, *supra* n 8, 11 Hofstra L Rev at 1027.

*Nearing,* we held that common law concepts of negligence were irrelevant when police had a specific duty under ORS 133.310(3) to take a person who violated a court order into custody, and that violation of that duty could give rise to a civil action in tort. The statute mandated that police arrest a person if the person violated a court order. We contrasted the use of "shall" in ORS 133.310(3) with the use of "may" in the previous subsections, stating that "shall" created a mandatory duty, while "may" created only authority to act. 295 Or at 709. Because ORS 161.336(6) states only that Providence *may* take a person into custody, the statute does not create a *Nearing v. Weaver* statutory tort.

This does not exclude a duty to exercise reasonable care. Although Providence did not have custody over Rijken, under the statute it could take him into custody or request that he be taken into custody if Rijken was "a substantial danger to others because of mental disease or defect and [Rijken was] in need of immediate care, custody or treatment." ORS 161.336(6). The statute authorized Providence to exercise control over Rijken. ORS 161.336(10) provides:

> "In determining whether a person should be committed to a state hospital, conditionally released or discharged, [PSRB] shall have as its primary concern the protection of society."

This duty to protect the public does not evaporate once PSRB conditionally releases a person to a community mental health provider. ORS 161.336(6), read with subsection (10), authorizes mental health providers to take patients into custody to protect members of the public, which included the plaintiff's decedent.

■ Once a statutory duty arises to protect third persons from Rijken's acts, the issue is whether Providence reasonably should have foreseen that those acts posed a risk of the kind of harm to a person such as Cain, *i.e.,* to someone using the streets, that occurred here. If we conclude that Providence could not have foreseen the harm to Cain, that conclusion must be determined as a matter of law because this case comes to us on summary judgment. If foreseeability of the harm to plaintiff's decedent was a question of fact, the summary judgment should have been denied. Therefore, we examine the facts of this case to determine if there was a question of fact whether Providence should have foreseen that Rijken could

harm Cain or a class of persons that included Cain. *See Stewart v. Jefferson Plywood Co., supra,* 255 Or 609-10 ("the question is whether the circumstances are out of the range within which a jury could determine that the injury was reasonably foreseeable"); *Dewey v. A.F. Klaveness & Co.,* 233 Or 515, 536, 379 P2d 560 (1963) (O'Connell, J., specially concurring).

We examine four key facts in this case to decide whether foreseeability of harm should be determined as a question of law or as a disputable question of fact:

1. Rijken was an outpatient of Providence;

2. Rijken did not threaten any person or threaten to drive so as to injure persons;

3. Rijken had been involved in a serious collision three years before the fatal collision with Cain; and

4. Rijken's mental condition had deteriorated during the days just before he allegedly caused the death of the decedent.

We discuss the significance of these four facts in order.

1. Concerning Rijken's status as an outpatient, the relationship between custodial patient and therapist differs from a relationship between outpatient and therapist. A psychotherapist may observe and control a patient in custody more than a patient seen only a few hours per week. The therapist of the custodial patient is better able to foresee that the patient might harm a particular victim or class of victims. But this is not to say that an outpatient's acts are not foreseeable at all. In the days just before the accident Providence counseled Rijken in person and had an opportunity to view his demeanor and behavior. Further, the Providence therapist also communicated with Rijken by telephone and was kept abreast of Rijken's current symptoms. The therapist had at least a limited opportunity to evaluate Rijken's mental condition. The fact that Rijken was an outpatient did not render his future acts unforeseeable as a matter of law.

2. The fact that Rijken did not threaten to harm any person or threaten to drive so as to injure persons reduced Providence's ability to foresee his harmful acts. Indeed, some courts have considered this fact in limiting liability to readily

identifiable victims. *See, e.g., Thompson v. County of Alameda, supra.* But in the case at bar, instead of limiting the duty of care in all cases to readily identifiable victims, we have considered the purpose of the statute on this issue. Here, Providence had a duty to control Rijken, not just for Rijken's sake, but for the peace and safety of the general public. The purpose of the conditional release statute is to keep mental patients out of hospitals while at the same time protecting the public. Thus the fact that Cain was not identified does not mean that Rijken's acts in harming Cain as an unidentified member of the public were not foreseeable.

3. The fact that Rijken had been involved in the previous offense described did not in itself make the 1981 collision with Cain foreseeable. Careless or reckless driving habits are hardly limited to psychiatric outpatients. With hindsight's 20/20 vision, it is easy to say that Providence should have foreseen that Rijken presented a risk to the public at large. Proof aided by hindsight that the therapist judged wrongly is insufficient to establish negligence. Foreseeability is measured by the way that a reasonable person should have understood the situation as it existed without the benefit of hindsight. However, the previous act of reckless driving brought Rijken under PSRB jurisdiction and reckless driving was a significant risk for Providence to consider in deciding to allow Rijken to remain in the community. The factfinder is entitled to weigh Rijken's past driving conduct on the issue of foreseeability.

4. Concerning Rijken's deteriorated mental condition, he told Providence that he feared he was losing control and was losing touch with the outside world. He reported that he was suffering from visual and color distortions and was experiencing auditory hallucinations. He missed a scheduled appointment and Providence neither attempted to take him into custody nor notified PSRB of these changed conditions in the patient. Whether Providence acted reasonably in not foreseeing that this deterioration could cause Rijken to lose control and harm a member of the public is a disputable question of fact.

Not one of the four facts discussed settles the liability issue for the defendant as a matter of law. As we have stated,

Providence had an obligation under the statute to act reasonably in treating and controlling conditionally released patients. Whether Providence should have reasonably foreseen the need to take Rijken into custody is a question to be resolved by the factfinder.

■    As a final matter, defendant claims that it has no liability and was entitled to a summary judgment because the state hospital "Discharge Summary/Conditional Release" expressly provided that Rijken was permitted to drive. The fact is that the "May Drive" comment was recorded by a physician at the Oregon State Hospital as a recommendation to the PSRB, and the order of conditional release signed by the PSRB chairman contained no such specific condition of release. It is true that under ORS 161.336(4)(e) Providence was bound to observe the conditions of the conditional release order. But the statement in the state hospital record was not made a condition of Rijken's release. It was at best a recommendation by a member of the hospital staff. Whether Rijken was mentally fit to drive was a decision for Providence, his current mental health provider. The fact that a physician once considered Rijken fit to drive is simply a relevant evidentiary fact for a factfinder to consider in determining if Providence acted reasonably. The entry in the hospital record does not justify granting summary judgment to the defendant.

The Court of Appeals is affirmed.