Argued and submitted April 25, 1985, reversed and remanded June 11, State Police's reconsideration and Nelson's reconsideration denied August 1, Lane County's reconsideration denied August 15, all petitions for review allowed September 9, 1986 (301 Or 765)

# NELSON,
*Appellant,*

*v.*

# LANE COUNTY et al,
*Respondents.*

## (16-83-05689; CA A32607)

720 P2d 1291

Robert D. Durham, Portland, argued the cause for appellant. With him on the briefs were Kulongoski, Durham, Drummonds & Colombo, Portland, American Civil Liberties Union, and Harry T. Carp as co-counsel with Robert D. Durham.

John F. Kilcullen, Eugene, argued the cause for respondents Lane County and David Burks. With him on the brief was Flinn, Brown & Roseta, Eugene.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for respondents Department of State Police, John C. Williams, K.E. Chichester, and Richard Geistwhite. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Joseph, Chief Judge, and Gillette, Judge Pro Tempore.

JOSEPH, C. J.

Richardson, P. J., specially concurring.

## JOSEPH, C. J.

Plaintiff was stopped and detained at a police roadblock that was conducted to apprehend persons driving under the influence of intoxicants (DUII). She brought this action for damages and injunctive and declaratory relief, contending that the stop and detention violated her statutory and federal and state constitutional rights. The trial court allowed defendants'[1] motions for summary judgment. Plaintiff appeals, and we reverse.

Two preliminary questions must be addressed. First, the county defendants move to dismiss the appeal as to them. The county and state defendants moved for summary judgment separately and at different times. Consequently, judgment was entered for the former on June 21, 1984, and for the latter on August 10, 1984. Pursuant to ORCP 67B, the trial court stated in the earlier judgment:

"[The Court] now being of the express opinion that there is no just reason for delay;

"IT IS HEREBY ORDERED and ADJUDGED that judgment be entered against Plaintiff and in favor of Defendants Lane County and David Burks * * *."

Plaintiff filed a notice of appeal from that judgment within 30 days after its entry, naming the county defendants as respondents. Within 30 days after the later judgment in the state defendants' favor was entered, plaintiff filed a separate notice of appeal from it, naming all defendants as adverse parties. The county defendants contend that the first judgment—which their attorney prepared—was not appealable, because it did not comply with ORCP 67B, and that plaintiff "did not file a second Notice of Appeal of the judgment in favor of" the county defendants after the judgment for the state defendants was entered. We do not agree that the first judgment failed to meet the requirements for finality prescribed by ORCP 67B.

■　　The county defendants rely on *Hale v. County of*

---

[1] The roadblock was conducted by state troopers and deputies of defendant Burks, the Lane County sheriff. Defendant Williams was the Superintendent of State Police, and defendants Chicester and Geistwhite are state police officers who participated in the roadblock. Where differentiation is necessary, we will refer to the county and Burks as "county defendants" and to the other defendants as "state defendants."

*Multnomah,* 298 Or 141, 144, 689 P2d 1290 (1984), where the court said:

> "Although in this case the trial court made an express determination that there was no just reason for delay, the document entitled 'Final Judgment' signed by the trial court does not contain an 'express direction for the entry of judgment' and thus does not track the language of ORCP 67 B. Even though it is implicit that the trial court intended that the judgment be entered immediately, and not at the conclusion of the entire action, we hold that the absence of an express direction to enter judgment is fatal. We read the plain language of ORCP 67 B. as requiring such an express direction."

The county defendants argue that here, as in *Hale,* "the judgment does not make an express direction for the entry of judgment." It is true that the judgment does not contain the *words* "express direction for the entry of judgment," but it is not correct that the judgment does not contain an express direction that it be entered. The fact that the trial court "ordered" that the judgment be entered instead of "expressly directing" its entry is inconsequential. The words "it is ordered" in that context constitute an "express direction." We are confident that the Supreme Court did not intend in *Hale* for jurisdiction to turn on choices between synonymous words or senses, and we deny the county's motion.

The disposition of the jurisdictional issue raised by the county leads to another question that should be answered. ORS 19.033(1) provides, in relevant part:

> "When the notice of appeal has been served and filed * * *, the Court of Appeals shall have jurisdiction *of the cause,* * * * but the trial court shall have such powers in connection with the appeal as are conferred upon it by law and shall retain jurisdiction for the taxation of attorney fees, costs and disbursements or expenses pursuant to rule or statute." (Emphasis supplied.)

If the emphasized language refers to and encompasses the whole action, then the effect of the notice of appeal from the June judgment was to deprive the trial court of jurisdiction to enter the August judgment. The August judgment would be void, and we would be required to dismiss the appeal from that judgment. That would leave only the judgment for the county in issue before us.

Neither *Hale v. County of Multnomah, supra,* nor *May v. Josephine Memorial Hospital,* 297 Or 525, 686 P2d 1015 (1985), the leading cases on the interpretation and application of ORCP 67B, resolves the question. In *May,* the court said:

> "In construing ORCP 67 B., we note that federal caselaw has not developed a precise test, for determining when there is no just reason to delay the entry of judgment * * *. [Citations omitted.] We, too, decline to enunciate a precise test but the following factors, whenever relevant, should be considered: * * * any prejudice caused to a party by postponing trial on the other claims or interests of other parties while the appeal is pending * * *." 297 Or at 531.

On its face, that language suggests that the court recognized that an appeal from a "67B judgment" prevents the trial court from continuing with any aspect of the case. However, in context, there is nothing in the language that compels us to apply it in its most literal way. Although there seems no reason to doubt that a trial court could, as a matter of discretion, refuse to continue with the trial of the residuum of a case in which there has been a judgment and an appeal under ORCP 67B, it seems contrary to the policy of the rule to *forbid* a trial court to proceed. Therefore, we read "cause" in the statute to refer only to the matter encompassed by the judgment from which the appeal is taken, and we hold that the trial court had jurisdiction to enter the August judgment and that all parties and issues are properly before us.

The second preliminary issue arises from the state defendants' motion—made for the first time at the oral argument in this court—to dismiss the claim for damages under plaintiff's state law theories on the ground that there cannot be an award of damages that is based solely on a violation of state constitutional rights. Stated otherwise, the state defendants assert that a violation of a state constitutional right is not in itself an actionable tort. *But see Bivens v. Six Unknown Fed. Narcotics Agents,* 403 US 388, 91 S Ct 1999, 29 L Ed 2d 619 (1971); *State v. Davis,* 295 Or 227, 666 P2d 802 (1983); *Urban Renewal Agency v. Lackey,* 275 Or 35, 549 P2d 657 (1976).

The traditional rule is that a motion to dismiss for failure to state a claim can be made at any time during the proceedings, including appeal. *See Telford v. Clackamas*

*County,* 44 Or App 399, 605 P2d 1365 (1980), and authorities cited there. However, the motion is not dispositive here: it pertains only to plaintiff's claim for damages on her state law theories and cannot affect her right to seek declaratory and injunctive relief under those theories or to seek relief under her federal theories. In short, the state defendants make no contention here that the complaint fails to state *any* claim. Their motion is effectively to strike plaintiff's prayer for certain damages and her allegations that relate only to those damages. The appropriate place for the motion to be considered in the first instance would have been the trial court. We decline to address the issue at this stage of the litigation. Even if the motion were meritorious, the trial court would nevertheless have discretion to permit plaintiff to attempt to plead a common law claim for damages, *e.g.,* for invasion of privacy, false arrest or false imprisonment. ORCP 23A.[2]

■ We turn now to the merits. Plaintiff's threshold argument on appeal is that the roadblock could not lawfully be conducted without statutory or regulatory authorization and that none existed. *See State v. Lowry,* 295 Or 337, 343, 667 P2d 996 (1983); *State v. Atkinson,* 298 Or 1, 6-9, 688 P2d 832 (1984). We conclude, however, that plaintiff did not adequately plead her authority theory. We turn to the theories that are well-pleaded.

Plaintiff contends that the stop and detention exceeded the limitations prescribed by ORS 131.615.[3] She explains:

"Either the officers were searching for drunken drivers

---

[2] Because we conclude that a resolution of the motion is not appropriate here, we need not consider the questions of whether and how an appellate court should review a post-judgment motion to dismiss for failure to state a claim in an appeal when the defendant has obtained a summary judgment in the trial court solely on substantive legal issues. *See* ORCP 21G(3), 23B; *Isler v. Shuck,* 38 Or App 233, 237, 589 P2d 1180 (1979).

[3] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

committing a crime, in which case ORS 131.615 applies, or they were searching for evidence of drunk drivers committing an infraction, in which case [former] ORS 484.353(2)(b)[4] applies. In either case, it is clear that plaintiff was not stopped because she had committed a traffic infraction or because any officer reasonably believed that she had committed a crime. The violation of such statutory limitations operates to invalidate the roadblock to the same extent as would violations of the applicable roadblock procedure, or the substantive provisions of the state or federal constitution."

ORS 131.615 appears on its face clearly to prohibit officers from stopping a person in order to search for evidence of a crime being committed unless there is some basis for a reasonable suspicion to believe that that person is committing a crime.

Defendants contend, however, that ORS 131.615 is inapplicable to checkpoint stops. They rely on *State v. Tourtillott,* 289 Or 845, 852-53, 618 P2d 423, *cert den* 451 US 972 (1980). The Supreme Court did decide there that the statute, which defines when police officers may stop people, does not apply to roadblocks:

"Additionally, the language of ORS 131.615 limits its application to investigations of crime where reasonable suspicion of criminal activity has focused on a particular individual. Checkpoint stops, or any other stop where there is no individualized suspicion of criminal activity, do not fall within this language." 289 Or at 853.

The logic of that escapes us. The court's conclusion is circular: Because the statute requires individualized suspicion of criminal activity, if the police stop a person without individualized suspicion, then the stop does not fall within the statutory prohibition. The express language of the statute *requires* reasonable suspicion of criminal activity before *any* stop is permissible. It does *not* say that, without individualized suspicion, every police stop is permissible. The legislature cannot

---

[4]*Former* ORS 484.353(2)(b) provided:

"(2) A police officer:

"* * * * *

"(b) May stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic infraction, identification and issuance of citation."

fairly be said to have intended to turn the language of two constitutions inside out or to believe that it could do so. The statute is clear on its face and should not have provisions read into it that do not exist. *See* ORS 174.010. Nonetheless, we are bound by the Supreme Court's decision and cannot hold that a DUII roadblock violates ORS 131.615.

■ Plaintiff next contends that the stop and seizure of her person violated her rights under Article I, section 9, of the Oregon Constitution, because the police did not have probable cause to stop and detain her. We agree.

Article I, section 9, prohibits unreasonable searches and seizures of people, their property and their effects. Traditionally, the reasonableness of a search or seizure depends on the factual circumstances and the presence or absence of individualized probable cause. *See State v. Lee,* 120 Or 643, 649, 253 P 533 (1927). The parties agree that no probable cause existed for stopping *any* particular person in *any* vehicle that drove past the roadblock, let alone plaintiff. Defendants argue, however, that the Supreme Court upheld the validity of roadblocks generally in *State v. Tourtillott, supra.*

Although *Tourtillott* purported to uphold the roadblock in issue there under Article I, section 9, as well as under the Fourth Amendment, the case was decided wholly on the basis of a Fourth Amendment analysis, and it is not authoritative on the state constitutional issue. *State v. Caraher,* 293 Or 741, 748 n 7, 653 P2d 942 (1982). In *Caraher,* the Supreme Court also destroyed the inevitability of parallel interpretation of Article I, section 9, and the Fourth Amendment.[5] It is a state court's duty to undertake independent analysis to interpret that state's constitution. 293 Or at 750. We have followed that principle with diligence in developing search and seizure law under Article I, section 9, of the Oregon Constitution. *See, e.g., State v. Flores,* 68 Or App 617, 685 P2d 999 (1984); *State v. Westlund,* 75 Or App 43, 705 P2d 208, *rev allowed* 300 P2d 332 (1985).

■ Defendants argue that, even under Article I, section

---

[5] Defendants also cite *State v. Shankle,* 58 Or App 134, 647 P2d 959 (1982), as a case upholding roadblocks. However, *Shankle* relied only on Fourth Amendment cases (*State v. Tourtillott, supra; Delaware v. Prouse,* 440 US 648, 99 S Ct 1391, 59 L Ed 2d 660 (1979)); also, it was decided before *State v. Caraher, supra.*

9, analysis, the Supreme Court has approved routine inventories of lawfully impounded automobiles without probable cause, if they are "conducted pursuant to a properly authorized administrative program." *State v. Atkinson, supra,* 298 Or at 10. Allowing the inventorying of an automobile lawfully in the control of the police for the purpose of protecting the police from allegations of theft and from the possibility of harm or protecting the property from loss or damage does not provide any rationale for permitting the stopping of motorists to discover DUII violations. Contrary to the circumstances in *Atkinson,* there are no lawfully impounded automobiles to be looked into at a roadblock. Neither is there any individualized suspicion sufficient to permit stopping a person or vehicle. A DUII roadblock serves no other purpose than as a method to search for law violators.[6] The Oregon Constitution prohibits such indiscriminate police invasion of personal liberty.

The concurrence would allow the stop and search of every person driving a car on the rationale that DUII is dangerous and that, when weighed in some balance, the public's need for protection is heavier than the constitution.[7] We, like the author of the concurrence, abhor "drunk driving," but we also abhor burglary, robbery and any other criminal activity. That, however, cannot lead us to ignore the constitution to the end that police can do what they deem sufficient and efficient to accomplish the objective of apprehending violators of the law. To allow such considerations to control over the constitutional requirement of individualized suspicion of wrongdoing would recreate the allowance of conduct no different from the conduct that our forefathers intended to prevent. A roadblock established to find DUII violations is an unreasonable search and seizure under Article I, section 9.

Plaintiff also raised a claim for damages under 42 USC § 1983 on the basis of police violation of her Fourth

---

[6] DUII is a criminal offense and subject to the criminal law protections afforded by the constitution. *Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 110, 570 P2d 52 (1977).

[7] On January 27, 1986, the *Oregonian* published a series of articles discussing Oregon's new and strict DUII laws and police roadblocks. The newspaper reported Portland Police Bureau statistics that police arrested 3,029 persons for DUII driving in 1985. Of those arrests, only nine occurred during the operation of roadblocks, even though more than 1000 drivers were stopped.

Amendment rights. Neither the United States Supreme Court nor the Oregon Supreme Court has addressed the question of whether DUII roadblocks are permissible under the federal constitution.[8] The United States Supreme Court in *Delaware v. Prouse, supra* n 5, decided that a police officer's random stop and detention of a driver was an unreasonable seizure under the Fourth Amendment. The Court stated that

> "the permissibility of a particular law enforcement practice is judged by *balancing its intrusion* on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." 440 US at 654. (Emphasis supplied.)

The Court also added that "the essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by governmental officials," which is usually measured by the existence of probable cause or, at the least, some quantum of individualized suspicion. 440 US at 654; *see also Terry v. Ohio,* 392 US 1, 21, 88 S Ct 1868, 20 L Ed 2d 889 (1968). In *Prouse* the Court said that the balancing of interests may sometimes preclude insistence on individualized suspicion and that other safeguards may be relied on to assure that an individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field." 440 US at 655, *quoting Camara v. Municipal Court,* 387 US 523, 532, 87 S Ct 1727, 18 L Ed 2d 930, (1967).

In *Prouse,* the court began the analysis by utilizing the balancing test to determine if the police procedure was more intrusive on individual rights than it was useful in promoting a legitimate government interest. It concluded that random stopping of vehicles is the kind of unfettered discretion that the constitution prohibits and that the marginal contribution to highway safety (by checking drivers' licenses and vehicle registrations) cannot justify the intrusion. 440 US

---

[8] The United States Supreme Court has only upheld the constitutionality of permanent border checkpoints. *United States v. Martinez-Fuerte,* 428 US 543, 96 S Ct 3074, 49 L Ed 2d 1116 (1976). In that instance the Court looked at the procedure used and determined that the intrusion on individual Fourth Amendment rights was minimal and that the public need for that enforcement technique was demonstrated by the record. 428 US at 562. That holding does not lead inevitably to the conclusion that all roadblocks are constitutionally valid. *See also United States v. Brignoni-Ponce,* 422 US 873, 95 S Ct 2574, 45 L Ed 2d 607 (1975).

at 661. Once the Court had determined that the intrusion was too great, the analysis ended. The Court specifically pointed out that the situation was not one of those "relatively unique circumstances" when previously specified "neutral criteria" could be relied on to protect constitutional rights. 440 US at 662; *see also Camara v. Municipal Court, supra; Marshall v. Barlow's, Inc.,* 436 US 307, 98 S Ct 1816, 56 L Ed 2d 305 (1978).

In *State v. Tourtillott, supra,* 289 Or at 857, the Oregon Supreme Court stated that it was adopting the process and the factors in *Prouse* and the border patrol cases (*see* note 8, *supra*) and then restated them in a different way: the importance of the governmental interests, the psychologically and physically intrusive nature of the procedure, the efficiency of the procedure in reaching its desired goals and the kind and degree of discretion vested in the individual officers. 289 Or at 864. The court reasoned that the enforcement of game and wildlife laws is very difficult because of the amount of thinly inhabited territory in Oregon and the number of hunting and fishing licenses sold. It said that a checkpoint was more effective in meeting the goal than a roving patrol, because it was established on the first weekend of the hunting season and was placed on a road where hunting travelers would be expected. The court specifically noted that location of a checkpoint *could* make it overly intrusive with respect to "legitimate traffic." 289 Or at 858 n 13. Finally, the court concluded that stopping every vehicle circumscribed the possibility of abuse of discretion on the part of the police. Taken all in all, the factors led the court to conclude that the checkpoint was not so intrusive as to violate the Fourth Amendment. Apparently, the court decided that enforcement of the game laws was one of those "unique circumstances" referred to in *Prouse* when neutral criteria are enough to protect constitutional rights.

In this case, the roadblock was established to detect and apprehend motorists who drink and drive unlawfully. As in *Prouse* and *Tourtillott,* we begin by balancing whether the procedure intrudes more than it promotes. The interest in catching those drivers is an important goal, but the interest is not different than the goal of catching violators of other criminal laws. The record contains little evidence as to the efficiency of the roadblock procedure. We know only that,

during the two and one-quarter hours it was maintained, only two DUII arrests were made, but the record does not show how that compares with arrests made on the basis of individualized suspicion in the course, say, of regular highway patrols. A police sergeant in charge of the operation said in an affidavit that the place for the roadblock was chosen because of the frequency of suspected intoxicated drivers, but there is no evidence to indicate why, or if, that road would have more "illegitimate traffic" than any other road. The police contend that they followed the procedures set out in the State Police Policy Manual for conducting license and registration checks and, therefore, that the discretion of individual officers was properly limited.[9] It is unclear how guidelines that limit an officer's discretion in checking driver's licenses and vehicle registrations can serve as adequate safeguards to limit discretion in the context of a DUII roadblock. Furthermore, the record does not indicate whether any of the guidelines would minimize the roadblock's intrusiveness by limiting the officers' discretion in choosing which motorists would be required to take field sobriety tests. The state admits that plaintiff *was* required to get out of her car and perform those tests, even though she did not show any signs of poor driving or intoxication.

 Whether or not a roadblock of the sort involved here would be found constitutional by the United States Supreme Court, the facts in this summary judgment proceeding record do not provide sufficient information to undertake the balancing test satisfactorily. We cannot decide, as a matter of law, that defendants did not violate the Fourth Amendment, for there are too many unresolved fact issues.

 One final point must be addressed. Plaintiff argues that the trial court erred in striking her claim for punitive damages against the individual defendants. ORS 30.270(2) provides that "no award of damages on any * * * claim [under the Oregon Tort Claims Act] shall include punitive damages." Plaintiff contends that the provision is inapplicable to both

---

[9] The manual also prohibited operating a roadblock at night and during peak traffic unless most unusual circumstances existed. The roadblock in this case was operated from 11 p.m. to 1:15 a.m., and it interfered with peak traffic created by a shift change at a local lumber mill. The record contains no evidence as to what the "most unusual circumstances" were that required violating the manual's provisions.

her state law and federal claims. There is no merit to her claim that she can recover punitive damages on her state law claims. However, whether ORS 30.270(2) applies to the federal law claims presents a closer question.

*Former* ORS 30.265(1) (effective when this action began) provides that the definition of a "tort" for purposes of the Tort Claims Act "includes any violation of 42 USC § 1983." Plaintiff notes that, had she brought her federal claims in federal court, she would be entitled to seek punitive damages. *See Smith v. Wade,* 461 US 30, 103 S Ct 1625, 75 L Ed 2d 632 (1983). She contends that a state cannot "impose limitations on rights or remedies created by federal law" and, therefore, that she may recover punitive damages for her federal claims even though she brought her action in an Oregon court. Plaintiff relies on *Maddox v. Clac. Co. Sch. Dist. No. 25,* 293 Or 27, 643 P2d 1253 (1982), as the sole authority for that proposition. *Maddox* does not assist her; the court there expressly declined to decide whether the state could impose the statutory tort claim notice requirement on a section 1983 action prosecuted in state court, 293 Or at 35, and said nothing that came any closer than that to being relevant to plaintiff's argument. *See also Suess Builders v. City of Beaverton,* 294 Or 254, 656 P2d 306 (1982).

The authorities almost uniformly support the conclusion that federal law, not state law, governs the question whether punitive damages may be awarded under section 1983. *Annot.,* 14 ALR Fed 608, 618. The United States Supreme Court has expressly left open the question of whether the states *must* make their courts available for the trial of section 1983 actions. *Martinez v. California,* 444 US 277, 283 n 7, 100 S Ct 553, 62 L Ed 2d 481 (1980). However, that does not bear on whether state courts that do exercise jurisdiction over such actions must provide punitive damages and other remedies that would be available. Section 1983 does not state such a requirement expressly; indeed, the statute says nothing about punitive damages. The United States Supreme Court has construed it to permit punitive damages by analogizing the conduct it proscribes to "the common law of torts (both modern and as of 1871 [when the first predecessor of section 1983 was enacted]), with such modification or adaptation as might be necessary to carry out the purpose and policy of the statute." *Smith v. Wade, supra,* 461 US at 34; *see*

*Carey v. Piphus,* 435 US 247, 98 S Ct 1042, 55 L Ed 2d 252 (1978). However, whether the statute *permits* awards of punitive damages and whether it *requires* state courts to award punitive damages that are contrary to state law are very different questions. We find no authority that decides the latter question.

■ Although *Smith* and *Carey* make it clear that the analogy to common law torts is not the only *possible* basis for allowing punitive damages in section 1983 cases, the analysis in *Smith* focused almost entirely on the common law analogy. In our view, it would be circular to conclude that section 1983 requires a state's courts to award punitive damages when the state's law prohibits punitive damages for that tort and when the reason for ascribing the intent to Congress to allow the recovery of punitive damages is that they are recoverable for comparable torts under case law that comes largely from the states. We find no basis for concluding that Congress intended section 1983 to preempt the Oregon statutory direction that its courts not award punitive damages in actions against its employes for torts committed in the performance of their duties. The trial court did not err in striking the claim for punitive damages.

Reversed and remanded for proceedings not inconsistent with this opinion.

**RICHARDSON, P. J.,** specially concurring.

I disagree with the lead opinion's conclusion that roadblocks aimed at the detection of drunk drivers are *per se* invalid under the Oregon Constitution, and I also disagree with much of the opinion's federal constitutional analysis. I join in the disposition only because I think that material questions of fact exist and that the trial court should not have decided the case by summary judgment.[1]

The lead opinion's reasoning and conclusion pertaining to Article I, section 9, of the Oregon Constitution can be summarized quite simply: its syllogism is (1) a roadblock to

---

[1] I agree with the lead opinion's conclusions that we have jurisdiction; that the state defendants' motion to dismiss should not be addressed; that the question of authority for the roadblock also does not require resolution; that ORS 131.615 does not apply to roadblock procedures in view of *State v. Tourtillott,* 289 Or 845, 618 P2d 423, *cert den* 451 US 972 (1980); and that plaintiff cannot seek punitive damages.

find violators of the DUII law is a search for criminal offenders and for evidence of crimes; (2) searches for and seizures of criminal offenders and evidence are, *without exception,* constitutionally impermissible unless there is probable cause to believe or individualized suspicion that a particular person has committed an offense; (3) therefore, a roadblock designed to discover drunk drivers violates Article I, section 9, because no individualized basis for suspecting that a particular driver is intoxicated preexists the discovery of that fact at the roadblock. That reasoning and conclusion are preceded in the opinion by the observation that state courts have a duty to construe state constitutional provisions independently of the interpretations that have been given analogous federal constitutional provisions.[2] In pursuit of its apparent understanding of that duty, the lead opinion performs its entire analysis of Article I, section 9, without even adverting to the significant body of Fourth Amendment case law which cogently disavows the lead opinion's critical assumption that *no* search or seizure can be constitutionally acceptable unless there is probable cause or individualized suspicion to justify it.

The United States Supreme Court said in *United States v. Martinez-Fuerte,* 428 US 543, 560, 96 S Ct 3074, 49 L Ed 2d 1116 (1976), where it sustained criminal arrests at border checkpoints, that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure * * * [b]ut the Fourth Amendment imposes no irreducible requirement of such suspicion." (Footnote and citation omitted.) Later, in *Delaware v. Prouse,* 440 US 648, 654-55, 99 S Ct 1391, 59 L Ed 2d 660 (1979), the Court stated:

"'* * * [T]he reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' *other safeguards are generally relied upon* to assure that the individual's reasonable expectation of privacy is not 'subject to

---

[2]I assume *only* for argument that the majority is correct in regarding *State v. Tourtillott, supra,* as not being controlling on the state constitutional issue. If the majority's understanding and my assumption are wrong, the Supreme Court presumably can say so much more clearly than it may have attempted to do in *State v. Caraher,* 293 Or 741, 748, n 7, 653 P2d 942 (1982).

the discretion of the official in the field.' " (Citations and footnotes omitted; emphasis supplied.)

In *State v. Tourtillott,* 289 Or 845, 854-57, 618 P2d 423, *cert den* 451 US 972 (1980), the Oregon Supreme Court spoke to the same effect, *at least* with respect to the Fourth Amendment. *See* note 2, *supra.*

The Supreme Courts of Oregon and the United States have concluded, after well-reasoned analysis, that the Fourth Amendment does not require an individualized basis for the stop of vehicles at roadblocks and other fixed stop points. As an alternative safeguard to individualized probable cause or suspicion, those courts have articulated a four factor balancing test, which was described in *State v. Tourtillott, supra*:

"(1) [T]he importance of the governmental interest at stake;

"(2) the psychologically and physically instrusive nature of the procedure;

"(3) the efficiency of the procedure in reaching its desired goals; and

"(4) the degree of discretion the procedure vests in the individual officers.

"No one factor is held to be determinative. * * *" 289 Or at 864-65.

Implicit if not explicit in *Prouse, Tourtillott* and the other Fourth Amendment cases, as I understand them, is that the rule they express pertains *only* to the checkpoint procedure itself and that probable cause or reasonable suspicion requirements attach to police actions that follow from but are not part of the procedure. If, for example, the procedure has been defined to require officers to stop every tenth vehicle, inspect papers and ask the driver whether and how much he has imbibed during the past several hours, the officers may pursue further investigative or detention measures only to the extent that usual probable cause or individualized suspicion requirements would permit. In other words, the officers may not expand a limited purpose roadblock into a full-scale search of a vehicle or its driver, unless probable cause justifying such a search arises during the roadblock. By a parity of reasoning, the officers are not foreclosed from going beyond

the purposes of the roadblock if, in the course of conducting it, a satisfactory probable cause or reasonable suspicion basis for a stop, search or arrest arises. For example, if a roadblock has been structured to require that every tenth vehicle be stopped, the officers would not impermissibly exceed the limits on their discretion by stopping the ninth car if they observed irregularities which gave them independent probable cause to believe that its driver was drunk.

As noted above, the lead opinion arrives at a very different rule from that of the Fourth Amendment cases, and it does so with no consideration of the reasoning in those cases. It is correct, as the lead opinion observes, that we have a responsibility to interpret the state constitution and that there is no "inevitability of parallel interpretation of Article I, section 9, and the Fourth Amendment." 79 Or App at 760. However, I do not subscribe to the lead opinion's operational understanding of our responsiblity, which seems to be that our "independent" duty requires us to construe the state provision in blissful ignorance of the treatment by other courts of virtually identical issues arising under a virtually identical constitutional provision. We have previously indicated that we must not only be familiar with prevailing interpretations of corresponding federal constitutional provisions before accepting or rejecting them as the state rule, but that we should also have a better reason for rejecting them than visceral disagreement. We said in *State v. Mills,* 76 Or App 301, 710 P2d 148 (1985), *rev den* 300 Or 546 (1986):

> "Although we may interpret our own state constitution to provide greater protection to our citizens than United States Supreme Court interpretations of the federal constitution provide, steps to adopt a stricter standard should be taken cautiously and be supported by reasoned analysis and sound policy considerations. * * *" 76 Or App at 305. (Citations omitted.)

I find no occasion to adopt a state constitutional rule here that differs from the federal rule. The reasoning of the federal constitutional cases is persuasive. Although a different conclusion from the one they reach is obviously tenable, it is by no means compelling. The individual rights assured by the Fourth Amendment and Article I, section 9, are amply protected by the *Prouse - Tourtillott* safeguards in connection with stops of vehicles at roadblocks. The only basis that the

lead opinion offers for a different Oregon rule is that recent holdings by the Oregon Supreme Court and this court have developed certain principles concerning search law and warrant requirements under Article I, section 9, that are not the same as the rules that have been developed under the Fourth Amendment. The issue here is related to the general issue in those recent cases only in that one is the diametric opposite of the other: the question here is not what the general search and warrant requirements under the respective constitutions *are* but whether those requirements, as opposed to the alternative safeguards that the United States and Oregon Supreme Courts have found to satisfy the Fourth Amendment, *have any application* to roadblocks. I would hold that the answer to the latter question is no, under Article I, section 9, as well as the Fourth Amendment.

After its seeming obliviousness to the existence of the Fourth Amendment cases throughout its discussion of the Article I, section 9, issue, the lead opinion finally turns to those cases in its discussion of plaintiff's section 1983 claim, which turns directly on whether the roadblock violated the Fourth Amendment. The lead opinion states that my opinion "would allow the stop and search of every person driving a car on the rationale that DUII is dangerous and that, when weighed in *some balance,* the public's need for protection is *heavier than the constitution.*" 79 Or App at 761. (Footnote omitted; emphasis supplied.) The emphasized language appears to attribute the balancing test to me rather than to the Fourth Amendment cases which *are* its source and which govern our consideration of the section 1983 issue. Moreover, the lead opinion language evinces a peculiar understanding of what I have balanced against what and of what the federal case law requires to be weighed. The balancing process under *Prouse* and *Tourtillott* is not a weighing of the public interest *against* the constitution; rather, it requires the courts to weigh governmental interests, intrusiveness and the other factors enumerated in *Tourtillott* to determine *if* constitutional requirements have been violated.

The lead opinion then proceeds to apply the balancing test to the Fourth Amendment issue in this case, and it concludes that there are factual questions which require reversal of the summary judgments. The opinion states that:

"* * * during the two and one-quarter hours it was maintained, only two DUII arrests were made, but the record does not show how that compares with arrests made on the basis of individualized suspicion in the course, say, of highway patrols. A police sergeant in charge of the operation said in an affidavit that the place for the roadblock was chosen because of the frequency of suspected intoxicated drivers, but there is no evidence to indicate why, or if, that road would have more 'illegitimate traffic' than any other road. The police contend that they followed the procedures set out in the State Police Policy Manual for conducting license and registration checks and, therefore, that the discretion of individual officers was properly limited.[9] It is unclear how guidelines that limit an officer's discretion in checking driver's licenses and vehicle registrations can serve as adequate safeguards to limit discretion in the context of a drunk driving roadblock. Furthermore, the record does not indicate whether any of the guidelines would minimize the roadblock's intrusiveness by limiting the officers' discretion in choosing which motorists would be required to take field sobriety tests. The state admits that plaintiff *was* required to get out of her car and perform those tests, even though she did not show any signs of poor driving or intoxication.

---

9

"The manual also prohibited operating a roadblock at night and during peak traffic unless most unusual circumstances existed. The roadblock in this case was operated from 11 p.m. to 1:15 a.m., and it interfered with peak traffic created by a shift change at a local lumber mill. The record contains no evidence as to what the 'most unusual circumstances' were that required violating the manual's provisions." 79 Or App at 764. (Emphasis in original.)

I have several problems with that statement. First, it assumes that every aspect of the police decision about where to locate the roadblock and how to conduct it is susceptible to judicial oversight. I do not think that the likelihood that drunk drivers will in fact be found in significant numbers on a particular road is a legal prerequisite to establishing a roadblock on it. It is at least arguable that the very unpredictability of where roadblocks will be located is what makes them effective and that placing them only on roads where *past* DUII incidence has been high will have the self-defeating effect of causing drunk drivers to avoid the beaten path. Second, and

relatedly, comparative arrest statistics may have some relevance to the inquiry. However, I do not agree with the lead opinion's implication that the arrest yield of a *particular* roadblock is of conclusive significance in assaying its validity. I disagree as well with the implication that the effectiveness of roadblocks is determinable by numbers of arrests alone; any deterrent effect they may have, among other considerations, can also be relevant.

My final difficulty with the lead opinion's statement is its understanding that the State Police Policy Manual guidelines governing officers' discretion in checking licenses and vehicle registrations cannot be effective "to limit their discretion in the context of drunk driving roadblocks." It may be that the license and registration inspection provisions of the manual do not *authorize* drunk driving roadblocks, but, as the lead opinion holds, authority is not an issue in this case. The immediate question is whether the guidelines from the manual, which were designated for use on the roadblock by a command decision, satisfy the requirement of curtailing the discretion of the officers actually conducting the roadblock. If the portions of the manual used are adequate to limit the discretion of the police as to which vehicles to select for license and registration checks, the same random selection guidelines can obviously be adequate to limit the officers' discretion over what vehicles to stop regardless of *why* they are being stopped. The officers' demand that plaintiff take field sobriety tests does not seem to me to be relevant to whether there was excessive police discretion *in connection with the roadblock procedure.* No party appears to assert that plaintiff's car was outside the preordained selection scheme determining which vehicles were to be stopped. Whether or not compelling plaintiff to submit to sobriety testing exceeded the scope of the roadblock or had to be justified independently by probable cause or reasonable suspicion are questions which—if the parties even raise them—turn on factual determinations that have not been made.[3]

I agree with the lead opinion that there are unre-

---

[3]The lead opinion states that plaintiff "did not show any signs of poor driving or intoxication." 79 Or App at 764. However, she did tell the officers that she had ingested some alcohol during the course of the evening. What the officers reasonably could have believed cannot be decided as a matter of law from this record, assuming that the decision of that matter is relevant to resolve the parties' contentions.

solved questions of fact that are pertinent to whether plaintiff's Fourth Amendment rights were violated. Because I conclude that the same constitutional rule should apply to both provisions, I would hold that the same questions are also germane to whether plaintiff's rights under Article I, section 9, were abridged. For reasons which follow from what I have said, I do not necessarily agree with the lead opinion about *what* questions of fact are material. However, I do concur in the holding that a plenary trial is necessary.