Argued and submitted October 8, 1986, Court of Appeals affirmed, trial court affirmed in part and reversed in part and remanded to trial court for further proceedings September 15, 1987

NELSON,
*Respondent on Review,*

*v.*

LANE COUNTY et al,
*Respondents,*

*and*

DEPARTMENT OF STATE POLICE et al,
*Petitioners on Review.*

(TC 16-83-05689; CA A32607; SC S33066)

NELSON,
*Petitioner on Review,*

*v.*

LANE COUNTY et al,
*Respondents on Review.*

(TC 16-83-05689; CA A32607; SC S33082)

NELSON,
*Respondent on Review,*

*v.*

LANE COUNTY et al,
*Petitioners on Review,*

*and*

DEPARTMENT OF STATE POLICE et al,
*Respondents.*

(TC 16-83-05689; CA A32607; SC S33115)

743 P2d 692

Dave Frohnmayer, Attorney General, Salem, argued the cause for petitioners on review, Department of State Police, John C. Williams, K.E. Chichester, and Richard Geistwhite. With him on the petition, additional authorities, and memorandum in response to court's questions were Virginia L. Linder, Solicitor General and Richard D. Wasserman, Assistant Attorney General, Salem.

Robert D. Durham, Portland, argued the cause for petitioner on review, Lynda Nelson. With him on the petition and memorandum of law was Kulongoski, Durham, Drummonds & Colombo, Portland.

Robert C. Cannon, Marion County Legal Counsel, Salem, argued the cause and filed the Lane County memorandum of law for petitioners on review, Lane County and David Burks. On the petition for review was John Hoag, Lane County Office of Legal Counsel, Eugene.

Robert C. Cannon, Marion County Legal Counsel, Salem, filed an *amicus curiae* brief in behalf of Marion County Board of Commissioners, Jackson County Board of Commissioners, Oregon Sheriffs Association, Oregon Association of Police Chiefs, and Oregon District Attorneys Association.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson, and Jones, Justices.

CARSON, J.

Jones, J., specially concurred and filed an opinion.

Peterson, C. J., dissented and filed an opinion in which Campbell, J., joined.

## CARSON, J.

This is the first of three cases we decide today involving the legality of sobriety roadblocks (that is, roadblocks conducted for the purpose of discovering persons driving while under the influence of intoxicants). The two companion cases are appeals from criminal convictions in which we held that state and local officials violated Article I, section 9, of the Oregon Constitution. *State v. Boyanovsky,* 304 Or 131, 743 P2d 711 (1987); *State v. Anderson,* 304 Or 139, 743 P2d 715 (1987).

The present case is an appeal from a civil judgment in which plaintiff seeks civil remedies against public officials. Three Oregon State Police officers, in conjunction with four members of the Lane County Sheriff's Department, conducted a sobriety roadblock in the late evening of December 17 and the early morning of December 18, 1982. The roadblock was set up on Marcola Road, between 42nd Street and Hayden Bridge Road, and was in operation from approximately 11 p.m. to 1:15 a.m. Plaintiff was stopped, questioned about her alcohol consumption, detained for sobriety field tests and then released.

Plaintiff filed a complaint for declaratory judgment, injunctive relief and money damages, including punitive damages, alleging violations of a state statute and the state and federal constitutions.

Pursuant to a defense motion, the circuit court struck plaintiff's claims for punitive damages from the original complaint as to the Department of State Police and its Superintendent. Later, the trial judge upheld the legality of the roadblock and granted summary judgment in favor of defendants. The Court of Appeals affirmed in part and reversed in part. The court held the roadblock unconstitutional under Article I, section 9, of the Oregon Constitution and did not decide the Fourth Amendment issue.[1] The Court of Appeals

---

[1] The Court of Appeals wrote:

"Whether or not a roadblock of the sort involved here would be found constitutional by the United States Supreme Court, the facts in this summary judgment proceeding record do not provide sufficient information to undertake the balancing test satisfactorily. We cannot decide, as a matter of law, that defendants did not violate the Fourth Amendment, for there are too many unresolved fact issues." *Nelson v. Lane County,* 79 Or App 753, 764, 720 P2d 1291 (1986).

agreed with the circuit court that plaintiff could not recover punitive damages under the Oregon Tort Claims Act. ORS 30.260 to 30.300. For the reasons that follow, we affirm the decision of the Court of Appeals. *Nelson v. Lane County,* 79 Or App 753, 720 P2d 1291 (1986).

## I. LEGALITY OF ROADBLOCK UNDER STATE LAW

■ If plaintiff had been arrested at the roadblock, or if there was evidence in the record that the police intended to arrest and prosecute any drivers found to be intoxicated, this case could be disposed of briefly. Seizures or searches for evidence to be used in a criminal prosecution, conducted without a warrant or suspicion of wrongdoing violate Article I, section 9, of the Oregon Constitution. *See State v. Boyanovsky, supra; State v. Anderson, supra.* Here, there is no direct evidence concerning the purpose of the roadblock. We can only infer that had plaintiff shown signs of intoxication, she would have faced arrest and prosecution under the criminal laws.

Further, this is a civil action for declaratory judgment and tort damages. Unlike the companion criminal cases in which the police seized and searched motorists without warrants, plaintiff has the burden of demonstrating claimed illegalities. We will examine all theories advanced under which the state and local officials' conduct may be found to be lawful.

A compelled stop of a person on a public road, of course, requires justification. The state presents two theories defending the roadblock. First, it argues that, for the reasons expressed in *State v. Tourtillott,* 289 Or 845, 618 P2d 423 (1980), this roadblock could be upheld as a matter of constitutional law. Second, it argues that the roadblock is a permissible "administrative" search conducted pursuant to a properly authorized administrative program.

In *State v. Tourtillott, supra,* this court was presented with the question of the constitutionality of a checkpoint or roadblock stop for game violations. A majority of the court upheld a subsequent conviction for a driver license violation that resulted from the roadblock. *Tourtillott* applied a federal Fourth Amendment analysis derived from *dictum* in *Delaware v. Prouse,* 440 US 648, 663, 99 S Ct 1391, 59 L Ed 2d 660

(1979), and from the United States Supreme Court's automobile border search cases, *United States v. Martinez-Fuerte,* 428 US 543, 96 S Ct 3074, 49 L Ed 2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 US 873, 95 S Ct 2574, 45 L Ed 2d 607 (1975). We have since described *Tourtillott* as a case decided "only on fourth amendment grounds, or on the basis of fourth amendment analysis." *State v. Caraher,* 293 Or 741, 749 n 7, 653 P2d 942 (1982).

In *Tourtillott,* this court addressed the issues on the defendant's terms, considering only the constitutional and statutory violations asserted. We expressly declined to determine the unraised question "whether the absence of a statute or rule specifically authorizing game checkpoint stops prohibits their use." 289 Or at 849 n 4. Nor did the *Tourtillott* majority distinguish between "administrative" and "criminal law enforcement" functions, although it drew its analysis from some of the cases that form the foundation of the United States Supreme Court's jurisprudence on administrative search law. *United States v. Martinez-Fuerte, supra; United States v. Brignoni-Ponce, supra.*

These issues are substantial ones which we found sufficiently pressing in *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984), to compel reversal and remand of a case involving impoundment of an automobile. This was done to enable the state to present whatever evidence existed that the impoundment was authorized by responsible policymakers and that the "noninvestigatory" inventory search was conducted pursuant to a properly authorized and administered program. We declined to reach the question whether the search otherwise violated Article I, section 9, without first determining whether the activity was authorized by law and carried out pursuant to regulation.[2]

---

[2] We often have stressed the need to examine statutory authority and the limitations imposed by that authority before reaching any constitutional question. *See State v. Scharf,* 288 Or 451, 454-55, 605 P2d 690 (1980); *State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979); *see also State v. Greene,* 285 Or 337, 346-47, 591 P2d 1362 (1979) (Linde, J., specially concurring). In the years between *State v. Tourtillott,* 289 Or 845, 618 P2d 423 (1980), and *State v. Atkinson,* 298 Or 1, 688 P2d 832 (1984), we reemphasized that requirement. *See State v. Painter,* 296 Or 422, 426-49, 676 P2d 309 (1984); *State v. Davis,* 295 Or 227, 241, 666 P2d 802 (1983); *State v. Lowry,* 295 Or 337, 343, 667 P2d 996 (1983); *State v. Thompson,* 294 Or 528, 531, 659 P2d 383 (1983); *see also Burt v. Blumenauer,* 299 Or 55, 70, 699 P2d 168 (1985); *Planned Parenthood Assn. v. Dept. of Human Res.,* 297 Or 562, 564, 687 P2d 785 (1984); *Jarvill v. City of Eugene,* 289 Or 157, 168-71, 613 P2d 1 (1980).

Plaintiff contended in the trial court that no authority existed for the roadblock and that the police had otherwise violated the state and federal constitutions and a state statute. The county and state defendants responded that their actions were in accordance with a procedure established in a document entitled The Oregon State Police Patrol Technique Manual. The state submitted into evidence the relevant pages of the manual. Defendants contended that the submitted section of the manual both authorized the roadblock procedure and regulated the administration of the procedure so as to ensure uniform treatment of persons stopped.

In an attempt to follow the analysis set out in *State v. Atkinson, supra,* the state relies upon ORS 181.030 as the source of authority for this roadblock procedure. This statute charges the state police with the duty to enforce the criminal laws, authorizing officers to "prevent crime" and "pursue and apprehend offenders and obtain legal evidence necessary to insure the conviction in the courts of such offenders."[3]

Much criminal and regulatory law enforcement activity takes place pursuant to authority implied from a broad statutory directive. A broad directive to enforce the criminal laws, such as ORS 181.030, together with the specification of crimes developed by lawmakers, implies authority to undertake tasks necessary to carry out the delegated function. By and large, agencies of the executive branch are free to carry out their assigned responsibilities in ways of their own choosing. Making explicit the manner in which an agency is to accomplish its task falls to the agency head or that official's designee to instruct or sub-delegate to subordinate officials.

However, some procedures may invade the personal freedoms protected from government interference by the constitution. Roadblocks are seizures of the person, possibly to be followed by a search of the person or the person's effects. For

---

[3] ORS 181.030 sets forth the duties of the Oregon State Police in part, as follows:

"(1) The Department of State Police and each member of the Oregon State Police shall be charged with the enforcement of all criminal laws.

"(2) Each member of the state police is authorized and empowered to:

"(a) Prevent crime.

"(b) Pursue and apprehend offenders and obtain legal evidence necessary to insure the conviction in the courts of such offenders."

this reason, the authority to conduct roadblocks cannot be implied. Before they search or seize, executive agencies must have explicit authority from outside the executive branch.

We are familiar with this requirement in the realm of criminal law enforcement. Article I, section 9, provides a method of extra-executive authorization in advance of searches or seizures — judicial approval of a constitutionally sufficient warrant. In *State v. Weist,* 302 Or 370, 376, 730 P2d 26 (1986), we explained that one function of Article I, section 9, "is to subordinate the power of executive officers over the people and their houses, papers, and effects to legal controls beyond the executive branch itself." Compliance with the warrant clause, or its few exceptions as this court has interpreted them, itself provides the necessary authorization for searches or seizures intended to discover evidence of crime.

In *Atkinson,* we suggested that another method existed for administrative searches.[4] We held that an administrative search conducted without individualized suspicion of wrongdoing could be valid if it were permitted by a "source of the authority," that is, a law or ordinance providing sufficient indications of the purposes and limits of executive authority, and if it were carried out pursuant to "a properly authorized administrative program, designed and systematically administered" to control the discretion of non-supervisory officers. 298 Or at 9, 10.

The purpose of the search and the consequences that flow from it are significant. In *Atkinson,* the purpose of the inventory was to protect impounded property and not for "enforcement purpose[s]." 298 Or at 8. Preventing prospective or ongoing violations is an administrative purpose as well, so long as the intended consequences of noncompliance with whatever standards the inspection is meant to uphold are noncriminal.[5] If offenders face criminal sanctions, the inspection implicates criminal law enforcement purposes and is not

---

[4] We used the terms "noninvestigatory," "civil" and "administrative" interchangeably in *State v. Atkinson, supra,* although "noninvestigatory" appears to be a misnomer. Administrative searches can be, and often are, conducted for purposes of investigation.

[5] We do not mean to suggest that if, while conducting a legally authorized and properly administered administrative inspection, officers came across evidence of another crime in plain view, that such evidence could not be used in a criminal prosecution. If the usual prerequisites for a "plain view" seizure are met, it could be.

"administrative" in nature. *See Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 570 P2d 52 (1977).

The trial judge upheld this roadblock because he found it to have been conducted in accordance with a road-block procedure set forth in the police manual. In response to plaintiff's contentions that the manual was neither a properly promulgated administrative rule nor complied with in the case, defendants rely upon the even-handed manner in which they claim to have conducted the roadblock. They suggest that "[n]o prior legislative or administrative action should be required to validate a traffic checkpoint conducted in a manner that does not involve the unconstrained exercise of discretion by individual officers."

While written procedures consistently applied may prevent a successful constitutional charge of arbitrary treatment,[6] compliance with an agency's own procedures does not answer the threshold question of authority. As we stated in *State v. Atkinson, supra,* in the context of a seizure of property, "[w]henever police officers obtain custody of private property for reasons other than by consent or seizure under a warrant or incident to a lawful arrest or exigent circumstances, the first step is to determine the source of the authority for the custody." 298 Or at 8-9.

Authority for administrative searches may be, and often is, provided by politically accountable lawmakers. As part of many agencies' regulatory responsibilities, the legislature has authorized reasonable inspections at times and places relevant to the agency's regulatory activity.[7] Sometimes, it has

---

[6] *See* Article I, section 20, of the Oregon Constitution; *State v. Freeland,* 295 Or 367, 667 P2d 509 (1983).

[7] Various agencies have explicit authorization to inspect: (1) business premises, ORS 472.170(1) (liquor licensees); ORS 619.036 (meat selling establishments); ORS 446.066 (mobile home parks); (2) potentially dangerous machinery, ORS 460.135 (elevators); ORS 480.580 (boilers and pressure vessels); (3) pollutants, ORS 453.105 (hazardous substances); ORS 468.095 (air and water pollution); and (4) some activities, ORS 517.770 (dredging operations).

The United States Supreme Court recently has noted, in a different context, that the "reasonableness" of a search or seizure may differ under the Fourth Amendment depending on the existence or absence of a regulation governing the search or seizure. *Griffin v. Wisconsin,* 483 US ____, ____, 107 S Ct 3164, 3172, 97 L Ed 2d 709 (1987).

The Oregon State Police have what appears to be an administrative vehicle inspection power. The State Police are authorized by statute to "require a person

required inspections to be carried out by means of a warrant process. For example, in safety and health inspections of workplaces, the probable cause requirement can be met by demonstrating compliance with legislative or administrative standards for conducting routine, periodic or area inspections. ORS 654.202 to 654.216. *See also* ORS 433.025, 433.130 (quarantine inspections).[8]

In this case, neither the state nor the county officials point to a statute or ordinance establishing an administrative scheme allowing sobriety roadblocks to prevent driving while intoxicated.[9] The state's reliance on ORS 181.030 is misplaced. That statute sets forth only the general criminal law enforcement duties of the Oregon State Police. *See* 304 Or 103 n 3.

Police stopped and seized plaintiff and her vehicle and interrogated her. This conduct was unauthorized and therefore unlawful, and plaintiff is entitled to declaratory judgment. ORS 28.010 to 28.160. Injunctive relief for this plaintiff is not necessary.

---

driving a vehicle * * * to stop and submit the vehicle * * * to an inspection of the mechanical condition and equipment thereof at any location where members of the Oregon State Police are conducting tests and inspections of vehicles and when signs are displayed requiring such stop." ORS 810.510(1). The purpose of such an inspection policy appears to be administrative — to prevent ongoing, existing violations of the vehicle equipment requirements. The results of failing to pass the inspection are noncriminal: issuance of either a vehicle repair warning (described in ORS 810.520), or a citation for an infraction, an offense "punishable only by a fine, forfeiture, suspension or revocation of a license or other privilege, or other civil penalty" and for which the offender "shall not suffer any disability or legal disadvantage based upon conviction of crime." ORS 153.270(1) and (2).

[8] We need not decide when it might be necessary to involve judicial officials in approving an administrative inspection involving searches or seizures to meet Article I, section 9, of the Oregon Constitution, an issue that would not arise if the legislature were to do so.

[9] For example, suppose that the legislature authorized an administrative checkpoint program to ensure driver sobriety and authorized officials to prevent intoxicated persons from driving by means other than criminal sanctions. Prevention then might entail refusing to release the vehicle to the intoxicated driver, ORS 809.710, taking intoxicated drivers to civil detoxification centers, ORS 426.460, perhaps license suspension or revocation, ORS chapter 813, or, as was done in Idaho, intoxicated drivers could be detained until they were fit to drive or provided with transportation home. *See* Note, *Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock Seizures,* 71 Georgetown L J 1457, 1463 n 32 (1983).

## II. TORT REMEDIES

In addition to a declaration of the illegality of the roadblock and a plea for injunctive relief, plaintiff seeks general damages of $100 and punitive damages of $5,000. She makes her claim for damages, in part, pursuant to the Oregon Tort Claims Act, ORS 30.260 to 30.300.

ORS 30.265(1) defines a tort for purposes of liability of public bodies, officers, employees and agents as

"* * * the breach of a legal duty that is imposed by law, other than a duty arising from contract or quasi-contract, the breach of which results in injury to a specific person or persons for which the law provides a civil right of action for damages or for a protective remedy."

The duty may derive from the common law, from statute or ordinance or from our constitution itself. Plaintiff apparently attempts to cover any of these alternative theories with her pleaded facts, which may state a claim for common law trespass, and by reference to the stop and inquire statute, ORS 131.615, and the state constitution, Article I, section 9.

Under the common law, an unauthorized intentional intrusion upon one's person, property, or effects is a trespass. The tort traditionally has encompassed a damage action against police officers for exceeding their authority to search or seize.[10]

In addition, we have recognized "statutory tort" duties in contexts where no common law duty exists but where a statute or ordinance created a special duty owed by a defendant to a plaintiff, usually arising from the status of the parties or the relationship between them. *See Cain v. Rijken,* 300 Or 706, 717 P2d 140 (1986) (statute governing commitment and release of patients imposed a duty on hospital serving as a community health provider to use reasonable care to protect the public); *Chartrand v. Coos Bay Tavern,* 298 Or 689, 696 P2d 513 (1985) (recognizing tort recovery under statute implicitly creating civil liability of tavern owner for injuries caused by visibly intoxicated patrons); *Nearing v. Weaver,* 295

---

[10] Oregon adopted the common law of England in its first code of laws in 1843. The origin of punitive damages at common law was a case of trespass for an arrest without a legal warrant. *Huckle v. Money,* 95 Eng Rep 768 (1763).

Or 702, 707, 670 P2d 137 (1983) (recognizing duty to arrest imposed by statute "for the benefit of individuals previously identified by a judicial order"); *Brennen v. City of Eugene,* 285 Or 401, 591 P2d 719 (1979) (city held to duty to enforce ordinance requiring adequate insurance for taxicabs); *Urban Renewal Agency v. Lackey,* 275 Or 35, 549 P2d 657 (1976) (counterclaim for breach of duty imposed by agency regulations held to allege a tort).

■ ■ Plaintiff's claim here is that the stop and inquire statute, ORS 131.615, creates a duty for law enforcement officers to seize persons only as prescribed by that statute.[11] However, in *State v. Tourtillott, supra,* 289 Or at 853, a majority of the court construed the stop and inquire statute differently. The majority held that the statute provided only one way to conduct lawful stops of citizens, but it was not the exclusive method. The statute interpreted in *Tourtillott* has not since been amended. This court is bound by its prior interpretations of statute. *State v. Loyer,* 303 Or 612, 614 n 2, 740 P2d 177 (1987); *State v. White,* 303 Or 333, 348, 736 P2d 552 (1987). The officers' failure to comply with the stop and inquire statute does not convert plaintiff's claim into a statutory tort.

The United States Supreme Court derived a federal "constitutional tort" against federal officials from the Fourth Amendment, in the absence of a federal common law of torts and recognizing the potential inadequacies of state tort law when exerted against federal agents. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 US 388, 394-95, 91 S Ct 1999, 29 L Ed 2d 619 (1971).

■ However, we need not pursue the dimensions of plaintiff's alternative tort theories. As noted above, we have an inadequate record upon which to determine the constitutionality of this roadblock. This case comes to us on appeal from a summary judgment; it will be remanded to the trial court for further proceedings. It therefore remains open to plaintiff to develop the factual and legal premises to support

---

[11] ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

her common law and constitutional tort theories if she chooses.

Plaintiff does not dispute that the Tort Claims Act precludes her from seeking punitive damages against these defendants. ORS 30.270(2). She bases her claim for punitive damages on the federal civil rights statute, 42 USC section 1983.

## III.   FEDERAL CIVIL RIGHTS ACTION

Title 42 USC section 1983 prohibits state officials operating "under color of" government authority from violating any of plaintiff's "rights, privileges or immunities secured by the Constitution and laws" which she enjoys as a United States citizen.[12] The relevant question is whether the roadblock violated plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

The disposition by the Court of Appeals of the Fourth Amendment issue — finding an inadequate factual basis upon which to undertake the balancing of interests — points up one difficulty an appellate court faces when it attempts to balance its way to a constitutional rule. If balancing competing interests were only a way to resolve an individual case, then the quality of the evidence in a particular case should affect the outcome directly. If, however, balancing is meant to reach a rule of law addressing and controlling categories of government activity, then the role of the evidence in any particular case is thrown into question. The difficulty is not new to the United States Supreme Court, but it remains unresolved, as is shown by the treatment of evidence of deterrence value of random license checks and availability of more effective enforcement alternatives by the majority and dissenting opinions in *Delaware v. Prouse, supra,* 440 US at 658-61, 665-66.

In its criminal procedure decisions in particular, the United States Supreme Court sometimes undertakes to assess

---

[12] 42 USC section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * *"

values difficult to reduce to quantifiable terms. For example, in cases similar to the present case, the Court purports to measure the interests of governments in regulatory and criminal law enforcement, the efficacy of the means chosen to reach goals, the degree of privacy citizens may expect in particular circumstances and how intrusive citizens would find particular police practices. Although the evidence in a particular case bears upon the Court's decision, the resulting analysis encompasses the larger process of choosing among values the Court perceives as competing.

Often trial courts are called upon to assess competing values in individual disputes. As we have indicated earlier in this opinion, however, we leave to state lawmakers in the first instance the policy choices necessary to regulate administrative searches, before examining state constitutional law. Nor do we perceive the United States Supreme Court to intend state courts to undertake Fourth Amendment balancing with values drawn from interests unique to the state. The Supreme Court seems to direct us toward a "national standard" of Fourth Amendment analysis. For this reason, we do not consider the sufficiency of evidence supporting or explaining the interests at stake in a particular case. Instead, and in the absence of direct guidance from the United States Supreme Court regarding a particular police practice such as a sobriety roadblock, we attempt to apply values the Court has already expressed in similar contexts.

In *Delaware v. Prouse, supra,* the Court affirmed the suppression of marijuana discovered during a traffic stop. The stop occurred without suspicion that the defendant was engaged in wrongdoing. Its purpose was to check driver licenses and vehicle registrations. In the course of its analysis, the United States Supreme Court drew distinctions relevant to the present case. It suggested that situations exist where the government's interest in searching and seizing without probable cause or reasonable suspicion could exceed citizens' Fourth Amendment interests. 440 US at 653-54. Further, in such cases the usual requirement of individualized suspicion must be replaced with controls on the officer's discretion. 440 US at 654-55. The Supreme Court thought roadblock stops, that is, fixed checkpoints at which all cars are stopped, to be less "intrusive" than random or roving stops. 440 US at 656-57. The Court considered the states' interest in highway safety

"vital," 440 US at 658, but concluded that random stops were neither sufficiently effective nor sufficiently regulated to control the officer's discretion. The majority's statement in explanation of its holding is significant: "Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." 440 US at 663. The concurrence echoes this theme. 440 US at 663-64.

The United States Supreme Court has indicated that the states' interest in traffic safety is great and that stationary roadblocks intrude on Fourth Amendment interests only minimally. The primary concern becomes then whether the roadblock was administered in such a way as to control the discretion of the officers. The evidence in this case indicates that it was. The roadblock was conducted at the direction of a supervising officer who instructed all officers in the roadblock procedure. All drivers were stopped. The only exceptions occurred when traffic became congested; some drivers were waived through until congestion cleared. The stopping officers informed motorists of the purpose of the checkpoint and asked for driver licenses and vehicle registrations. If there was suspicion that the driver was under the influence of an intoxicant, the driver was asked to perform a field sobriety test. Otherwise, motorists were able, after these inquiries, to drive on.

As we understand the United States Supreme Court, it would hold that this fairly consistent treatment of motorists would suffice under the Court's federal standards as the type of safeguard necessary to limit the officers' discretion. The Court has not indicated that written standards for roadblocks are necessary. Of importance is the actual execution of the roadblock. The supervising officer relied on a manual setting forth procedures for license check roadblocks. These standards were substantially complied with in the case.

Having found no Fourth Amendment violation, we need not reach the question whether punitive damages or attorney fees are available in federal civil rights actions brought in state court.

The decision of the Court of Appeals is affirmed. The decision of the trial court is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings in accordance with this opinion.

**JONES, J.,** specially concurring.

I concur in the result for the reasons stated by Justice Gillette in his specially concurring opinions in *State v. Boyanovsky,* 304 Or 131, 743 P2d 711 (1987), and *State v. Anderson,* 304 Or 139, 743 P2d 715 (1987). I agree that there was no Fourth Amendment violation and, therefore, no need to reach the question whether punitive damages or attorney fees are available in federal civil rights actions brought in state court.

**PETERSON, C. J.,** dissenting.

I disagree with the majority. The state and federal constitutions aim to protect individuals against the excesses of government. In interpreting the constitution we must be mindful of the legitimate needs of the government and other citizens. The majority's decision protects the rights of the individual stopped but fails to recognize legitimate needs of the government and other citizens. I therefore disagree with virtually every holding in the majority opinion insofar as sobriety checkpoint stops are concerned.

Woodrow Wilson described the Constitution as follows:

"The Constitution itself is not a complete system; it takes none but the first steps in organization. It does little more than lay a foundation of principles. It provides with all possible brevity for the establishment of a government having, in several distinct branches, executive, legislative, and judicial powers. It vests executive power in a single chief magistrate, for whose election and inauguration it makes carefully definite provision, and whose privileges and prerogatives it defines with succinct clearness; it grants specifically enumerated powers of legislation to a representative Congress, outlining the organization of the two houses of that body * * *; and it establishes a Supreme Court ample authority * * *. Here the Constitution's work of organization ends, and the fact that it attempts nothing more is its chief strength. For it to go beyond elementary provisions would be to lose elasticity and adaptability. The growth of the nation and the consequent development of the governmental system would snap asunder a constitution which could not adapt itself to the measure of the new conditions of an advancing society. If it could not stretch itself to the measure of the times, it must be thrown off and left behind, as a by-gone device; and there can, therefore, be no question that our Constitution has proved lasting

because of its simplicity. It is a corner-stone, not a complete building; or, rather, to return to the old figure, it is a root, not a perfect vine."[1]

The Constitution of the United States is a remarkable instrument. Though filled with elegant ambiguities, it is meant to apply to everyday life.

The ambiguities guarantee continual tension between the departments of government. Experience has proved, however, that this very tension insures a stable government, with no department gaining ascendancy over the other. This tension, which creates seemingly destructive friction at times, has created growth in the governed society. The instrument, written 200 years ago this year, was designed to accommodate change without impairing its inherent effectiveness.

The Bill of Rights, written several years later, is also written in broad, general terms. It limits the power of government, sometimes with clear, unmistakable clarity; at other times with unmistakable ambiguity. The Bill of Rights, no less than the document of which it became a part, also has accommodated changes. Indeed, it often has been the catalyst for needed societal change.

Like the original constitution, the Bill of Rights was written with a view to a maintenance of a proper tension between the departments of government, as well as tension between the rights of the governed and the governors, a tension that rarely is constant. The constitution's elasticity is part of its greatness.

The existence of rights guaranteed by the constitution in only general terms creates, in addition, uncertainty. The tension and uncertainty result, at times, from a conflict between two or more beneficial public policies. Shall the Executive Branch have the right to administer foreign policy without interference from the Legislative Branch? Does a person have the right to speak out at any time and any place on any subject, without respect to the harm that might (or will) result from the exercise of free speech?

---

[1] Wilson, Congressional Government (1885), *quoted in* Padover, The Living United States Constitution 57 (1953).

The Fourth Amendment is a particularly ambiguous statement of a right — the right of persons to be free from "unreasonable searches and seizures." What is an unreasonable search or seizure? Is it "unreasonable" to subject every person to a search before boarding a public air carrier? Is it unreasonable to subject every person to a search before entering a courtroom?

The answers to these questions are anything but clear if one looks at only the words in the constitution. The answers, usually but not always, are made by courts, and often are controversial. The interpretations given by courts are themselves subject to change. The starting point is, however, that the Fourth Amendment statement in terms of the right — "the right of [all persons] to be secure * * * against unreasonable searches and seizures" — also states the limitation upon the right — persons have no right to be secure from searches and seizures that are not unreasonable.

Or, looking at the Fourth Amendment strictly in terms of a limitation upon the power of government, the governors may make some searches and seizures of persons without a warrant. All courts of this land, state and federal, recognize this. The case reports contain thousands of reports of situations involving the enforcement of the criminal law in which warrantless searches and seizures have been upheld.

Each case — every one — involves tension between the right of those governed to be secure from unreasonable searches and seizures and the legitimate law enforcement needs of the governors. It is permissible for a police officer to search a person arrested for a felony to see if a bulge in the jacket or pocket is a gun or a knife. Safety deems such a search not unreasonable. There, the tension (or conflict, if you prefer) between the rights of the governed and the governors, tips in favor of the latter.

What determines whether a search or seizure is unreasonable? A host of factors are implicated, some of which will be discussed below. The starting point is worthy of restatement: The constitution itself is designed to protect the rights of those governed, the rights of others in society, and to accommodate the legitimate needs of the governors. Some warrantless searches and seizures are permissible. Others are not.

In 1980, this court upheld a criminal conviction of a driver based upon evidence obtained at a game checkpoint roadblock. The court stated the test as follows:

> "The test is easily articulated. In determining the constitutionality of a particular government procedure, the promotion of the legitimate government interest at stake is balanced against the individual's right to have his or her privacy and personal security be free from arbitrary and oppressive interference. The Court has considered the following factors to be important:
>
> "(1)  the importance of the governmental interest at stake;
>
> "(2)  the psychologically and physically intrusive nature of the procedure;
>
> "(3)  the efficiency of the procedure in reaching its desired goals; and
>
> "(4)  the degree of discretion the procedure vests in the individual officers.
>
> "No one factor is held to be determinative. As with any balancing test, its application to a particular set of facts may prove to be difficult."

*State v. Tourtillott,* 289 Or 845, 864-65, 618 P2d 423 (1980), *cert den* 451 US 972 (1981).

The question involved in this case has been considered by a number of state and federal courts. The answers (though not apparent from the majority opinion,[2] more on this later) are surprisingly consistent. Sobriety checkpoint stops, if conducted pursuant to safeguards (that will be discussed below), are permissible without a warrant and without authorizing legislation.

---

[2] In this dissent, I have referred to the "majority opinion" and the plurality opinion. There is, of course, but one lead opinion. There are other opinions. I read the opinions to say:

1. Five of us say that sobriety checkpoint stops for the purpose of prosecuting drunk drivers are *per se* unconstitutional.

2. Three of us say that sobriety checkpoint stops are proper if authorized by the legislative branch, but that drunken drivers may not be prosecuted for drunken driving as a result of evidence thereby obtained.

3. Two of us say that properly conducted sobriety checkpoint stops are permissible to find, arrest and prosecute drunk drivers.

The logical starting point is: Why was the seizure or search necessary or appropriate?

Intoxicated drivers may well create the largest law enforcement problem in the United States.

Nationally:

- Approximately 50 percent of all traffic fatalities occur in alcohol-related crashes. This means that more than 20,000 lives are lost each year in alcohol-related crashes.

- About 560,000 people are injured each year in alcohol-related crashes, 43,000 of them seriously.

- More than half of alcohol-related fatalities occur in single vehicle crashes.

- About two-thirds of all people killed in alcohol-involved crashes are drivers or pedestrians who had been drinking, while one-third are innocent victims: drivers or non-occupants (primarily pedestrians and pedalcyclists) and passengers in either vehicle.

- The proportion of alcohol-related fatal crashes is about three times greater at night than during the day. Between midnight and 4 a.m., about 80 percent of drivers killed have been drinking.[3]

In Oregon:

- In 1985, 558 persons were killed on Oregon's streets and highways and 37,204 persons were injured, 4,506 of them seriously. It is estimated that at least half of these crashes were caused by an intoxicated driver.

- 23,807 persons were arrested for DUII in Oregon in 1985. This is 20.3% of all reported arrests in the state.

- In 1985, 11,483 persons were convicted of DUII — about 33.5% for a second or subsequent time. In

---

[3] Data compiled by NHTSA/National Center for Statistics and Analysis (August 1986).

1984-85, 14,503 first offenders entered a diversion program.

- Drivers who have been drinking kill and injure more people than all the other violent criminals put together.

- 1986, there were 22,415 arrests for DUII and 11,331 convictions.[4]

Most courts have upheld sobriety checkpoint stops, after considering the need. I quote from representative opinions.

"The importance of the governmental interest here involved is beyond question. 'The carnage caused by drunk drivers is well documented and needs no detailed recitation here' (*South Dakota v. Neville,* 459 US 553, 558; see, also, *Mackey v. Montrym,* 443 US 1, 17-18, n 9; Presidential Commission on Drunk Driving, An Interim Report to the Nation [1982]; Report of Governor's Alcohol and Highway Safety Task Force [1981]; Drunk Driving Reform in New York State, 1980-84, Report of the Subcommittee on Drunk Driving of the Assembly Transportation Committee; L 1981, ch 910, § 1 ['Because of the persistence of the problem, it is essential that the state take further steps to protect those who make use of roads from the needless deaths, injuries and property damage resulting from drunk driving']; Ifft, Curbing the Drunk Driver Under the Fourth Amendment: Constitutionality of Roadblock Seizures, 71 Georgetown LJ 1457, n 1)."

*People v. Scott,* 63 NY 2d 518, 525-26, 483 NYS 2d 649, 473 NE2d 1 (1984).

"We find that no Fourth Amendment or Article 26 violation occurred when appellants were stopped at the sobriety checkpoint involved in the present case. Clearly the State has a compelling interest in controlling drunk driving. Indeed, as the record discloses, about sixty percent of the drivers killed in automobile accidents have elevated levels of alcohol in their blood; nationally, fifty-five percent of all traffic fatalities are alcohol related. The magnitude of the problem created by intoxicated motorists cannot be exaggerated. As the Supreme Court said recently in *South Dakota v. Neville,* 459 U.S. 553, 558, 103 S Ct 916, 920, 74 L.Ed.2d 748 (1983):

'The situation underlying this case — that of the drunk

---

[4] Data compiled by the Oregon Traffic Safety Commission (1985).

driver — occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. See *Breithaupt v. Abram,* 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957)("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate v. Short,* 401 U.S. 395, 401, 91 S.Ct. 668, 672, 28 L.Ed.2d 130 (1971)(BLACKMUN, J., concurring)(deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez v. Campbell,* 402 U.S. 637, 657 and 672, 91 S.Ct. 1704, 1715 and 1722, 29 L.Ed.2d 233 (1971)(BLACKMUN, J., concurring)("The slaughter on the highways of this nation exceeds the death toll of all our wars"); *Mackey v. Montrym,* 443 U.S. 1, 17-18, 99 S.Ct. 2612, 2620-2621, 61 L.Ed.2d 321 (1979)(recognizing the "compelling interest in highway safety").' "

*Little v. State,* 300 Md 485, 504-05, 479 A2d 03, 912-13 (1984).[5]

"Several states have considered the issue in connection with driver's license check roadblocks or in some cases more candidly described as DUI roadblocks. It is obvious, without resort to the record or otherwise, that the problem of the drunk driver is one of enormous magnitude affecting every citizen who ventures forth upon the streets and highways. There can be no doubt that there is an overwhelming public and governmental interest in pursuing methods to curtail the drunk driver. Most states, however, which have considered the validity of roadblocks to 'check drivers' licenses and auto registration' or to check for drunk drivers have found the methods used to be violative of Fourth Amendment rights and as failing to meet the implied tests set forth in the extensive dicta in *Prouse.* The use of a DUI roadblock has principally two purposes: (1) to apprehend and remove the drunk driver from the streets before injury or property damage results, and (2) in serving as a deterrent to convince the potential drunk driver to refrain from driving in the first place. As a fringe benefit the DUI roadblock also serves to disclose other violations pertaining to licenses, vehicle defects, open containers, etc."

---

[5] The Maryland case also contains an extensive discussion of the cases from other states. *See Little v. State,* 300 Md 485, 498-503, 479 A2d 903 (1984).

*State v. Deskins,* 234 Kan 529, 536-37, 673 P2d 1174 (1983).

The existence of crime does not authorize police officers to stop and search anyone they please. The existence of a law enforcement problem does not justify any means to meet the challenge. The means chosen must be effective in meeting the challenge, responsive to the challenge, and not unreasonably intrusive. If less intrusive methods are available, those methods must be pursued.

I am satisfied that sobriety checkpoint stops are a reasonable response to the threat and advance the public interest because:

1. Some drunken drivers are identified and removed from the highways, both temporarily, and if convicted, for longer periods. The threat to public safety is reduced.

2. The detection of drunken drivers in such a manner may be more effective than by roving patrols. At the hearings before the Senate Committee on Commerce, Science and Transportation, there was evidence that one out of every 50 drivers on the highway has a blood alcohol count of .10 or higher.[6] *See also State v. Superior Court,* 143 Ariz 45, 691 P2d 1073 (1984) (increased patrols have not reduced injuries from alcohol-related accidents). It has been estimated that only one of every 2,000 drunken drivers is apprehended.[7]

3. Finally, and most importantly, the deterrent effect from sobriety checkpoint stops is great. Publicized in advance (as many such checkpoint stops are), the beneficial effect is considerable for others using the highway, for the intoxicated person and his or her family and loved ones, as well as for others who are aware of the governmental action and change their conduct as a result. The perception of imminence of detection is a substantial deterrent. Roadblock stops are an effective weapon to apprehend drunken drivers and to deter drunken driving.

---

[6] Federal Legislation to Combat Drunk Driving Including National Driver Register, Hearings on S. 671, S. 672, S. 2158 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science and Transportation, 97th Cong., 2d Sess. 112 (1982) (hereinafter "Hearings") *cited in* 4 LaFave, Search and Seizure 73 n 97 (2d ed 1987).

[7] Hearings, *supra,* note 5 at 55, Quade, The Drunk Driver, 69 A.B.A.J. 1201, 1202 (1983), *cited in* 4 LaFave, *supra* at 73 n 98.

Comments of other courts concerning the efficacy of sobriety checkpoint stops include these:

"DUI roadblocks serve the public interest in different but related ways. On the one hand, DUI roadblocks are a *safety* measure, operating as one method of detecting motorists driving while under the influence of intoxicating liquor. The arrest of an individual immediately removes such driver from the public highway, eliminating at least one immediate (albeit temporary) threat to public safety. For those suspects who are subsequently convicted of driving while under the influence of intoxicating liquor, pursuant to the provisions of 23 V.S.A. § 1201 (1978 and Supp.1984), the penalties imposed under 23 V.S.A. §§ 1206, 1208 (Supp.1984) will suspend or revoke their right to legally operate a motor vehicle on a public highway.

"On the other hand, DUI roadblocks act to further the public interest in reducing the number of motorists driving while under the influence of intoxicating liquor by acting as a *deterrent* to any person who might consider driving after drinking. Once the public is aware that DUI roadblocks are not per se illegal, and may be utilized by state and local law enforcement authorities, drivers are more likely to think carefully about the possibility of being apprehended and prosecuted for driving while under the influence of intoxicating liquor."

*State v. Martin*, 145 Vt 562, 569-70, 496 A2d 442 (1985) (emphasis in original).

"The value of roadblocks in decreasing drunk driving is attested by both the United States Department of Transportation and the Governor's Alcohol and Highway Safety Task Force. A 1983 paper on Safety Checkpoints For DWI Enforcement issued by the Department of Transportation's National Highway Traffic Safety Administration's Office of Alcohol Countermeasures emphasizes the importance of informing the public about DWI checkpoint operations as the chief means of deterring driving while intoxicated (*id.,* at p 26), and the Governor's Task Force found 'that the systematic, constitutionally conducted traffic checkpoint is the single most effective action in raising the community's perception of the risk of being detected and apprehended for drunk driving' (Report, at p 103). Moreover, the Supreme Court has held deterrence to be a legitimate governmental purpose not only with respect to legislation (*South Dakota v. Neville,* 459 US, at p 559, *supra;* see *Delaware v. Prouse,* 440 US, at p. 660, *supra*), but also with respect to checkpoint stops (*United*

*States v. Martinez-Fuerte,* 428 US, at p 557, 96 S Ct at p. 3082, *supra;* see *United States v. Villamonte-Marquez,* 462 US 579, 588, 103 S Ct 2573, 2579, *supra).* We conclude, therefore, as did the Maryland Court of Appeals in *Little v. State (supra)*(see, also, *State v. Shankle,* 58 Or App 134, 647 P2d 959, *supra)* that deterrence by fear of apprehension is a constitutionally proper means of keeping drunk drivers off the highways, though it may not be with respect to pedestrians (see *People v. Johnson,* 63 NY2d 888, 483 NYS2d 201, 472 NE2d 1029).

"* * * * *

"Nor, finally, is there sufficient question about the productivity of DWI checkpoints to require invalidation of the procedure. The contrary argument is based on the effectiveness of the procedure as a means of apprehension and ignores entirely its deterrent effect. There can be no question that substantial reductions have occurred since 1980 in the deaths, injuries and damage resulting from drunken driving. Thus, the Report of the Subcommittee on Drunk Driving of the Assembly Transportation Committee (at p 2) contains findings that highway fatalities from 1980 to 1983 decreased by 21%, while the risk of being in an accident, as measured by vehicle miles traveled, increased by 5.5%; alcohol-involved fatal accidents decreased 25% from 1981 to 1983; all accidents have declined by less than 1.5% since 1980, while reported alcohol-involved accidents have fallen at almost ten times that rate (14.5%); accidents during bar hours have declined 21.3% since 1980, while nonbar hour accidents actually have increased 3.6%; and fatal accidents during bar hours have decreased 33% since 1980, while nonbar hour fatal accidents have decreased only 11%. The extent to which those results stem from legislative reforms during that period as distinct from the deterrent effect of roadblocks and other educational and public information programs aimed at combatting the problem is not revealed, but in our view is not of constitutional moment. It is enough that such checkpoints, when their use becomes known, do have a substantial impact on the drunk driving problem (*Little v. State,* 300 Md, at p 504, 479 A2d at 913, *supra).* The State is entitled in the interest of public safety to bring all available resources to bear, without having to spell out the exact efficiency coefficient of each component and of the separate effects of any particular component (cf. *Mackey v. Montrym,* 443 US, at p 19, *supra).* There being a reasonable basis for concluding that considering both its detection and its deterrence effect, the DUI checkpoint procedure in question is a valuable component of

the program to control drunk driving, we conclude that it is a sufficiently productive mechanism to justify the minimal intrusion involved."

*People v. Scott, supra,* 63 NY 2d at 526-28 (1985) (footnotes omitted).

If need and efficacy are established (and I believe that they are), what must exist for a sobriety checkpoint stop to pass muster? For the answer to this question I look to the cases cited in the appendix.

Although a number of sobriety checkpoint stops have been struck down for failure to meet the criteria listed below, all but two courts that have considered this question have held that sobriety checkpoint stops are permissible without statute or rule if specified criteria are met.

Most courts have concluded that sobriety checkpoint roadblock stops pass constitutional muster if:

1. The roadblock is established and conducted pursuant to a plan formulated or approved by executive-level officers of the applicable law enforcement agency.

2. The plan contains reasonable standards respecting the time and place and manner of conducting the stop.

3. The execution of the roadblock stop involves no exercise of discretion by the officers conducting it.[8]

4. The roadblock must have the appearance of regularity so that motorists are not put in fear.[9]

5. The length of detention must be short.

___

[8] All cars could be stopped. Or every fifth or tenth car could be stopped. Or all could be stopped until a predetermined number are stopped. Such alternatives would be permissible, but are by no means exclusive.

[9] Signs might be posted notifying motorists of the reason for the stop. Advance notice might be published in the papers or given on television and radio. The absolute minimum notice would be "adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion." *Compare State v. Hillesheim,* 291 NW2d 314, 318 (Iowa 1980) (checkpoint stop violated Fourth Amendment; checkpoint was haphazardly located by police officers in field, officers attempted to stop motorists at night, using only red lights on their vehicles and flashlight signals, there were no prewarning signs or lights nor any illumination, and there was no system devised to stop traffic systematically and maintain roadblock for significant period of time).

### 6.   The interrogation should be reasonable.[10]

I see no threat to the state or federal constitutional rights of persons if such procedures are followed. Indeed, I am convinced that the test is a reasonable one, whether viewed through the eyes of James Madison in 1789, a hypothetical James Madison in 1987, or John Q. and Jane F. Public in 1987.

The intrusion is not substantial. The Maryland court's discussion on this point is typical.

"Balanced against the State's compelling interest in detecting and deterring drunk driving, the intrusion on individual liberties caused by the checkpoints is minimal. The checkpoints are operated under limitations imposed by clear, carefully crafted regulations approved by high level administrators. The regulations severely restrict the discretion of the officers in the field. All vehicles are stopped; there is virtually no risk that motorists will be singled out arbitrarily. The procedures to be followed when communicating with each driver are set forth in detail in the regulations; thus, the risk of police harassment is greatly reduced. The amount of fright and annoyance caused to motorists who pass through the checkpoints is minimal. Adequate advance warning of the checkpoint is given; motorists who do not wish to stop may make a U-turn and follow a different route. Moreover, a driver who stops at the checkpoint but refuses to roll down the car window is allowed to proceed. The stops themselves last less than a half a minute. Officers do not interrogate motorists or search their vehicles. Each checkpoint is well illuminated and staffed by a sufficient number of uniformed officers to show that it is a legitimate exercise of police authority. Ample

---

[10] I commend this procedure described in *Little v. State,* 300 Md 485, 491, 479 A2d 903 (1984):

"'All traffic approaching the checkpoint will be stopped as long as traffic congestion does not occur. The trooper will approach each motorist and state, 'I am Trooper (*John Doe*) of the Maryland State Police. You have been stopped at a sobriety checkpoint set up to identify drunk drivers.' If there is no immediate evidence of intoxication, a traffic safety brochure developed specifically for this enforcement strategy will be given to the motorist. The trooper will suggest to the motorist that he read the brochure at a later time for a more complete explanation of the stop. The motorist will then be assisted to safely proceed.'

"The brochures also contain a questionnaire for the motorist to return with comments about the program. Each checkpoint stop lasts between fifteen and thirty seconds"

I also note that ORS 807.570 requires that all drivers carry a driver's license that must be presented upon the request of a police officer.

provision is made for the safety and convenience of the public; operation of the checkpoints is suspended if traffic becomes congested. The sobriety checkpoints are operated pursuant to a comprehensive set of detailed regulations; they function in a manner that minimizes the possibility of fright and inconvenience to the public. In this regard, we think the effect upon the motorist resulting from the officer's use of a flashlight is greatly exaggerated by appellants."

*Little v. State, supra,* 300 Md at 506.

Article I, section 9, of the Oregon Constitution does not prohibit sobriety checkpoint stops. Though the case cited above was decided under the Fourth Amendment, the text of section 9 is not materially different. As we have done on other occasions, we are free to apply the same rule.[11]

Pursuant to ORS 181.280, the legislature has delegated to the Superintendent of State Police the general authority to make instructions and rules[12] concerning the manner in which state police carry out their duties as prescribed in ORS 181.030 and 181.040, including the enforcement of laws relating to the operation of vehicles on all highways such as the requirements of carrying a license and vehicle registration while driving a motor vehicle and not driving while under the influence of intoxicants. In promulgating rules under which officers are to exercise their administrative duties under the traffic laws, it was within the authority of the State Police Superintendent to provide for administrative inspection procedures for licenses, registration and sobriety of drivers similar to those enacted by the legislature for equipment inspections. *Cf.* ORS 810.510 (equipment inspection procedure).

We recognized in *State v. Lowry,* 295 Or 337, 344 n 6, 667 P2d 996 (1983), that authorization for police action may be found in the state police manual. I assume that the court realized in that case that authority for rulemaking lay with the State Police Superintendent under ORS 181.280. In this case, the record includes a memorandum dated December 7, 1982,

---

[11] *State v. Kell,* 303 Or 89, 95, 734 P2d 334 (1987); *State v. Sparklin,* 296 Or 85, 89, 672 P2d 1182 (1983); *State v. Tourtillott,* 289 Or 845, 854, 618 P2d 423 (1980).

[12] The plaintiff did not raise the issue of whether the rules were or had to be promulgated in accordance with the Administrative Procedures Act at the trial court.

reflecting amendments to the state police manual by the State Police Superintendent. I cite our statement in *Lowry* and the record here to demonstrate that, consistent with the legislative charge, the source of the rules in the state police manual is the State Police Superintendent.

With respect to roadside checkpoints, the state police manual states in part:

"The U.S. Supreme Court, in Delaware v. Prouse (No 77-1571, 3/27/79) prohibits random vehicle stops but permits inspection or roadblock procedures if the procedures followed are pursuant to pre-established and specifically declared department policy. The decision as to which vehicle is to be stopped must not be at the discretion of the member.

"This restriction, of course, does not apply where a member has an articulable and reasonable suspicion that the motorist is in violation of the motor vehicle laws.

"Prior to instituting the inspection procedure, a decision must be made as to the method of selecting vehicles, such as:

"1.   All passing vehicles will be stopped, or

"2.   A designated number, such as every fifth vehicle or every tenth vehicle will be stopped, or

"3.   The first passing vehicle will be stopped, with all other vehicles permitted to pass until the inspection is completed, at which time the very next vehicle must be stopped for inspection. This procedure is then repeated until the completion of the inspection.

"Good judgment must prevail to insure that all of the following cardinal principles are observed:

"1.   The site selected must afford ample room for off pavement parking and an unobstructed view from either direction for a considerable distance.

"2.   Motorists approaching the selected spot must be given timely warning to stop by means of an inanimate sign judiciously placed or by a member posted where he can do so by signal if more than one vehicle at one time is to be halted and held in line.

"3.   To conserve everyone's time each member when taking part in an extensive inspection, will be assigned to specific tasks to perform according to prearranged plan. No motorist will be detained any longer than is absolutely necessary. Tactful handling and courteous treatment is indispensable to an efficient and well managed operation.

"4. The Trooper present with greater tenure will be in charge, except when three or more members are engaged a Senior Trooper or Non-Commissioned officer will be on hand to exercise command. Regular uniform will be worn.

"5. Unless most unusual circumstances dictate the need, checks will not be held on Saturday afternoons, Sundays or holidays, not during hours of darkness, not while traffic is at its peak and not on freeways.

"6. The rights of motorists must be given full consideration and extreme care exercised that we do not exceed the bounds of our authority.

"* * * * *"

On December 7, 1982, the State Police Superintendent amended these rules and directed "all state police stations and posts [to] enter into a cooperative effort with local sheriffs for the purpose of organizing and conducting joint operator's license, vehicle registration inspection, and detection of drunk drivers." The key change was the lifting of all nighttime, weekend and holiday restrictions. These rules demonstrate that specifically declared departmental policy and guidelines were formulated by the state police authorizing officers to make sobriety checkpoint stops.

The plurality, however, places a limitation upon the powers necessarily implied by the nature of the police function and would require express legislative approval for some practices:

"However, some procedures may invade the personal freedoms protected from government interference by the constitution. Roadblocks are seizures of the person, possibly to be followed by a search of the person or the person's effects. For this reason, the authority to conduct roadblocks cannot be implied. Before they search or seize, executive agencies must have explicit authority from outside the executive branch."

*Nelson v. Lane County,* 304 Or 97, 103, 743 P2d 692 (1987).

Although the plurality recognizes that a "broad directive to enforce the criminal laws * * * together with the specification of crimes developed by lawmakers impl[ies] authority to undertake tasks necessary to carry out the delegated function," *id.* at 103, under a newly fashioned rule of statutory construction they would apparently limit such implied authority to acts which do not implicate Article I, section 9 interests.

I disagree. Either the police have authority or they do not — if that is the issue. If they have such delegated authority, either express under a statute or implied by the nature of the duty imposed by the legislature, then the issue becomes one under the constitution. In *State v. Atkinson,* 298 Or 1, 6, 688 P2d 832 (1984), we stated: "It is not our function to decide as a matter of policy how, and for what purpose, automobiles or other private property that come into official custody should be examined." Similarly it is not our function to decide as a matter of policy how and for what purpose persons and their vehicles should be seized, so long as the actions do not violate the law.

The state police manual is designed to eliminate the possibilities for the "exercise of discretion" by state police officers at a temporary traffic checkpoint, and as indicated by the record in this case, the checkpoints were administered in compliance with the manual. The manual contains neutral criteria for detaining motorists; the officers at the checkpoint had no discretion in picking motorists for the initial stop. The requirement of neutrality is satisfied by stopping every vehicle or by other procedures "that equate with, but are less intrusive than, a 100% roadblock," "such as stopping every 10th car to pass a given point," *Delaware v. Prouse,* 440 US 648, 663-64, 99 S Ct 1391, 59 L Ed 2d 660 (1979) (Blackmun, J., concurring) *quoted in State v. Tourtillot, supra,* 289 Or at 857, or "waving traffic through when a predetermined number of cars have been backed up." Comment, 20 Idaho L Rev 127, 155 (1984) *quoted in* 4 LaFave, Search and Seizure 79 (2d ed 1987). *See People v. Bartley,* 109 Ill 2d 273, 93 Ill Dec 347, 486 NE2d 880 (1985) (all vehicles stopped except on one occasion when traffic backed up); *Lowe v. Commonwealth,* 230 Va 346, 337 SE2d 273 (1985) (all vehicles stopped except when congestion occurred) *cited in* LaFave, *supra* at 79 n 127.

I read the majority opinion to hold that sobriety checkpoint stops for the purpose of detecting and prosecuting crime are *per se* impermissible.

I read the plurality opinion to hold that sobriety checkpoint stops are permissible for administrative purposes if authorized by the legislative branch and if certain criteria — criteria not unlike those I listed above — are met. *But no person can be prosecuted for drunken driving if the evidence of*

*drunken driving is obtained in whole or in part from the road-block.*

The majority holds that sobriety checkpoint stops may not be used to detect drunken drivers and to obtain evidence to prosecute drunken drivers. Only two jurisdictions, Oklahoma and Pennsylvania, have reached that conclusion. *See* appendix, part III. Other courts considering this issue have reached the conclusion that properly executed sobriety roadblocks may be used to detect and prosecute drunken drivers. *See* appendix, parts I and II.

We are still a Jeffersonian democracy; I do not advocate a government run by Madame LaFarge. But times change. Intoxilyzers and sobriety checkpoint stops were not needed in 1787 or 1887. But they are needed in 1987. Courts have reacted to technological change by limiting "new" intrusions, intrusions possible by reason of improved technology. *See, e.g., Katz v. United States*, 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967) (telephone booth eavesdropping). Courts should and must respond to new societal problems stemming from bigger and faster cars and more intoxicated persons using the highway. Sobriety checkpoint stops are an appropriate response.

The plurality either adopts or comes close to creating the rule that acts of law enforcement officials must be expressly authorized by legislative act. I am troubled by the implications of the plurality opinion.

There is no textual source, either in the Oregon or United States Constitution, for the regulatory/criminal distinction propounded by the majority. To the contrary, the constitutional text, when read in conjunction with other provisions expressly restricted to civil cases or criminal prosecutions, affirmatively weighs against that distinction. The historical background of those provisions, which lies primarily in protests against abuse of regulatory searches by the Crown, further militates against the position of the majority.

I would affirm the trial court.

APPENDIX

I

Cases upholding sobriety checkpoint stops: *State v. Superior Court in and for County of Pima*, 143 Ariz 45, 691 P2d

1073 (1984); *Ingersoll v. Palmer,* 221 Cal Rptr 659, 184 Cal App 3d 1198 (1985), *rev granted* 224 Cal Rptr 719, 715 P2d 680 (1986); *State v. Golden,* 171 Ga App 27, 318 SE2d 693 (1984); *Illinois v. Bartley,* 109 Ill 2d 273, 93 Ill Dec 347, 486 NW2d 880 (1985); *State v. Garcia,* 481 NE2d 148, *aff'd on reh'g* 489 NE2d 168 (Ind App 1985); *State v. Riley,* 377 NW 2d 242 (Iowa App 1985); *State v. Deskins,* 234 Kan 529, 673 P2d 1174 (1983); *Kinslow v. Commonwealth,* 660 SW2d 677 (Ky App 1983); *Little v. State,* 300 Md 485, 479 A2d 903 (1984); *Massachusetts v. Trumble,* 396 Mass 81, 483 NE2d 1102 (1985); *Stark v. Perpich,* 590 F Supp 1057 (D Minn 1984); *State v. Coccomo,* 177 NJ Super 575, 427 A2d 131 (1980); *Opinion of the Justices,* 509 A2d 744 (NH 1986); *People v. Scott,* 63 NY 2d 518, 483 NYS 2d 649, 473 NE2d 1 (1984); *State v. Alexander,* 22 Ohio Misc 2d 34, 489 NE2d 1093 (1985); *Lowe v. Commonwealth,* 230 Va 346, 337 SE2d 273 (1985).

## II

Cases invalidating sobriety checkpoint stops in particular cases but not holding that such stops are *per se* unconstitutional: *State ex rel Ekstrom v. Justice Court of State,* 136 Ariz 1, 663 P2d 992 (1983); *State v. Jones,* 483 So2d 433 (Fla 1986); *State v. McLaughlin,* 471 NE2d 1125 (Ind App 1984); *State v. McGeoghegan,* 389 Mass 137, 449 NE2d 349 (1983); *State v. Muzik,* 379 NW2d 599 (Minn App 1985); *State v. Crom,* 383 NW2d 461 (Neb 1986); *State v. Koppel,* 127 NH 286, 499 A2d 977 (1985); *State v. Kirk,* 202 NJ Super 28, 493 A2d 1271 (1985); *State v. Olgaard,* 248 NW2d 392 (SD 1976); *Webb v. State,* 695 SW2d 676 (Tex App 1985); *State v. Martin,* 496 A2d 442 (Vt 1985); *State v. Marchand,* 104 Wash 2d 434, 706 P2d 225 (1985).

## III

Cases holding sobriety checkpoint stops *per se* unconstitutional: *Commonwealth v. Tarbert,* 348 Pa Super 306, 502 A2d 221 (1985); *State v. Smith,* 674 P2d 562 (Okla App 1984).

## IV

Criteria established by other courts include these:

"As a general rule, a DUI roadblock will pass constitutional muster if: (1) the initial stop and the contact between the officers in the field and the motorist involves an explanation

of the nature of the roadblock and minimal detention of a nonimpaired driver; (2) the discretion of the officers in the field, as to the method to be utilized in selecting vehicles to be stopped, is carefully circumscribed by clear objective guidelines established by a high level administrative official; (3) the guidelines are followed in the operation of the roadblock; (4) approaching drivers are given adequate warning that there is a roadblock ahead; (5) the likelihood of apprehension, fear or surprise is dispelled by a visible display of legitimate policy authority at the roadblock; and (6) vehicles are stopped on a systematic, nonrandom basis that shows drivers they are not being singled out for arbitrary reasons."

*State v. Martin,* 145 Vt 562, 571, 496 A2d 442 (1985) (footnote omitted).

"Numerous conditions and factors must be considered in determining whether a DUI roadblock meets the balancing test in favor of the state. Among the factors which should be considered are: (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test. Not all of the factors need to be favorable to the State but all which are applicable to a given roadblock should be considered."

*State v. Deskins,* 234 Kan 529, 541, 673 P2d 1174 (1983).